ACCEPTED
03-14-00375-CV
4213371
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/19/2015 1:56:30 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00375-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/19/2015 1:56:30 PM
JEFFREY D. KYLE
Clerk

AUSPRO ENTERPRISES, LP,
*Appellant*,

v.

TEXAS DEPARTMENT OF TRANSPORTATION,
*Appellee.*

On Appeal from the
345th Judicial District Court of Travis County, Texas

## APPELLEE'S BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

SCOTT A. KELLER
Solicitor General

DOUGLAS D. GEYSER
Assistant Solicitor General
State Bar No. 24059817

MATTHEW BOHUSLAV
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2540
Fax: (512) 474-2697
*douglas.geyser@texasattorneygeneral.gov*

**ORAL ARGUMENT CONDITIONALLY REQUESTED**

## TABLE OF CONTENTS

Index of Authorities..................................................................iv

Statement of the Case ..............................................................x

Statement Regarding Oral Argument ......................................xi

Issues Presented.....................................................................xii

Statement of Facts ...................................................................2

    I.     The Texas Highway Beautification Act.................................2

    II.    AusPro's Illegal Sign .................................................8

Summary of Argument...............................................................9

Argument...................................................................................11

    I.     The Restrictions Imposed By The Act And Its Implementing Regulations Are Valid Time, Place, And Manner Restraints. .........................................11

        A.    Time, Place, And Manner Restrictions Are Subject To Intermediate Scrutiny. ...........................................11

        B.    *Barber* Controls The Outcome Here. ...........................13

            1.    *Barber* held that the Act is a valid time, place, and manner restriction..........................13

            2.    AusPro's purported distinctions of *Barber* are meritless.......................................17

        C.    Intermediate Scrutiny Governs AusPro's Challenge................................................21

        D.    The Act And Its Regulations Pass Intermediate Scrutiny. ................................................32

II.   The Permitting And Licensing Regulations Are Also Content Neutral And Thus Not Unconstitutional Prior Restraints. .............................................................. 34

    A.   AusPro Forfeited Its Challenge To The Licensing And Permitting Regulations. ........................................ 35

    B.   Regardless, AusPro's Prior-Restraint Challenge Is Meritless. ............................................................... 37

        1.   The licensing and permitting regulations are content neutral. .................................................. 38

        2.   The regulations contain adequate standards to control official discretion. ............................... 42

III.  The Act And Its Regulations Do Not Violate The Texas Constitution. ............................................................ 46

Prayer ................................................................................ 49

Certificate of Service ....................................................... 50

Certificate of Compliance ................................................ 50

Appendix

iii

# INDEX OF AUTHORITIES

## Cases

*Bentley v. Bunton,*
    94 S.W.3d 561 (Tex. 2002)........................................................46-47

*Bloedorn v. Grube,*
    631 F.3d 1218 (11th Cir. 2011) ...............................................44-45

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) .......................................................................20

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985) .......................................................................27

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ........................................................ 15, 30, 33

*City of Antioch v. Candidates' Outdoor Graphic Serv.,*
    557 F. Supp. 52 (N.D. Cal. 1982) .................................................23

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) .......................................................................14

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994) ........................................................... 14, 19, 29

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) .................................................................36, 44

*City of Painesville Bldg. Dep't v. Dworken & Bernstein Co.,*
    *L.P.A.,* 733 N.E.2d 1152 (Ohio 2000) ..........................................24

*City of Renton v. Playtime Theatres,*
    475 U.S. 41 (1986) .........................................................................28

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984) .................................................................12, 31

*Collier v. City of Tacoma,*
 854 P.2d 1046 (Wash. 1993) (en banc) ............................................24

*Covenant Media of S.C. v. City of N. Charleston,*
 493 F.3d 421 (4th Cir. 2007) ........................................ 15, 26, 27, 41

*Curry v. Prince George's Cnty., Md.,*
 33 F. Supp. 2d 447 (D. Md. 1999) ................................................23

*Davenport v. Garcia,*
 834 S.W.2d 4 (Tex. 1992)......................................................... 47, 48

*Freedman v. Maryland,*
 380 U.S. 51 (1965) .......................................................................37

*Frisby v. Schultz,*
 487 U.S. 474 (1988) ......................................................................11

*Granite State Outdoor Adver., Inc. v. City of St. Petersburg,*
 *Fla.*, 348 F.3d 1278 (11th Cir. 2003).......................................38, 44

*Hill v. Colorado,*
 530 U.S. 703, 719 (2000) ........................................ 12, 19, 20, 25, 26

*John Donnelly & Sons v. Campbell,*
 639 F.2d 6 (1st Cir. 1980)............................................................22

*Kinney v. Barnes,*
 443 S.W.3d 87 (Tex. 2014)...........................................................46

*Knoeffler v. Town of Mamakating,*
 87 F. Supp. 2d 322 (S.D.N.Y. 2000) ............................................23

*Lauder, Inc. v. City of Houston, Tex.,*
 670 F.3d 664 (5th Cir. 2012) .................................................37, 45

*Maryland v. Universal Elections, Inc.,*
 729 F.3d 370 (4th Cir. 2013) .......................................................31

*McCormack v. Twp. of Clinton*,
872 F. Supp. 1320 (D.N.J. 1994) (mem. op.) ................................ 23

*Members of the City Council of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ..................................................................... 20

*Messer v. City of Douglasville*,
975 F.2d 1505 (11th Cir. 1992) .................................................... 15

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) ............................................................... 11, 14

*Nat'l Adver. Co. v. Town of Babylon*,
900 F.2d 551 (2d Cir. 1990) ......................................................... 23

*Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546 (Tex. 1998) .................................... 46

*Orazio v. Town of N. Hempstead*,
426 F. Supp. 1144 (E.D.N.Y. 1977) .............................................. 23

*Rappa v. New Castle Cnty.*,
18 F.3d 1043 (3d Cir. 1994) ......................................................... 22

*S. Or. Barter Fair v. Jackson Cnty., Or.*,
372 F.3d 1128 (9th Cir. 2004) ................................................. 44, 45

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*,
595 F.3d 588 (5th Cir. 2010) ............................................. 26-27, 41

*Snyder v. Phelps*,
131 S. Ct. 1207 (2011) ................................................................. 31

*Tex. Dep't of Pub. Safety v. Garcia*,
327 S.W.3d 898 (Tex. App.—Austin 2010, pet. denied) ................. 36

*Tex. Dep't of Transp. v. Barber*,
111 S.W.3d 86 (Tex. 2003) ................................................... *passim*

*Tex. Entm't Ass'n v. Combs,*
    431 S.W.3d 790 (Tex. App.—Austin 2014, pet. denied)........... 46, 47

*Thomas v. Chi. Park Dist.,*
    534 U.S. 316 (2002) ...............................................37, 42

*Union City Bd. of Zoning v. Justice Outdoor Displays, Inc.,*
    467 S.E.2d 875 (Ga. 1996)..........................................22

*United States v. Stevens,*
    559 U.S. 460 (2010) ...............................................22, 23

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ............................... 12, 13, 14, 32, 44

*Wheeler v. Comm'r of Highways,*
    822 F.2d 586 (6th Cir. 1987) (cited in *Barber*)........................ 15, 29

*Whitton v. City of Gladstone, Mo.,*
    54 F.3d 1400 (8th Cir. 1995) ......................................23

## Constitutional Provisions, Statutes and Rules

TEX. CONST. art. I, § 8........................................... x, xii, 46, 47, 48

23 U.S.C. § 131(b).................................................2

23 U.S.C. § 131(c) ...............................................2

43 TEX. ADMIN. CODE § 21.142(14) .......................................40

43 TEX. ADMIN. CODE § 21.144 ..........................................7

43 TEX. ADMIN. CODE § 21.146(a) .................................... 4, 7, 38

43 TEX. ADMIN. CODE § 21.146(a)(9).......................................7

43 TEX. ADMIN. CODE § 21.147(a) .......................................26

43 TEX. ADMIN. CODE § 21.147(a)(1).......................................26

43 Tex. Admin. Code § 21.148 .............................................................. 40

43 Tex. Admin. Code § 21.149 ................................................... 39, 40, 41

43 Tex. Admin. Code § 21.149(b) ........................................................ 40

43 Tex. Admin. Code § 21.152 ......................................... 7, 38, 42, 43

43 Tex. Admin. Code § 21.153 .............................................................. 38

43 Tex. Admin. Code § 21.152(a) ........................................................ 40

43 Tex. Admin. Code § 21.153(b) ............................................. 39, 40, 41

43 Tex. Admin. Code § 21.159 ......................................................... 8, 42

43 Tex. Admin. Code § 21.163(d) ........................................................ 43

43 Tex. Admin. Code § 21.164(a) ........................................................ 43

43 Tex. Admin. Code § 21.166(a) ..................................................... 7, 38

43 Tex. Admin. Code § 21.182 ................................................. 8, 38, 43

43 Tex. Admin. Code § 21.189 ................................................. 8, 39, 43

43 Tex. Admin. Code § 21.190 ......................................................... 8, 39

Tex. Gov't Code § 311.032(c) ...................................................... 27, 41

Tex. Transp. Code § 391.001(10) .................................................... 3, 15

Tex. Transp. Code § 391.002(b) ........................................................... 2

Tex. Transp. Code § 391.005 ................................................. 5, 7, 18, 34

Tex. Transp. Code § 391.031(a) ........................................................... 3

Tex. Transp. Code § 391.031(b) ........................................................... 3

Tex. Transp. Code § 391.031(b)(1) ...................................................... 4

TEX. TRANSP. CODE § 391.031(b)(3) ........................................................24

TEX. TRANSP. CODE § 391.031(b)(4) ........................................................34

TEX. TRANSP. CODE § 391.031(d) ..............................................................8

TEX. TRANSP. CODE § 391.032(a).............................................................38

TEX. TRANSP. CODE § 391.061..................................................................34

TEX. TRANSP. CODE § 391.061(a)...............................................................7

TEX. TRANSP. CODE § 391.067..............................................................7, 34

TEX. R. APP. P. 33.1(a) .............................................................................36

## Other Authorities

39 TEX. REG. 7954 (2014) ..........................................................................7

## STATEMENT OF THE CASE

*Nature of the Case*:    The Texas Department of Transportation (the "Department") sued AusPro Enterprises, LP ("AusPro") for civil penalties and injunctive relief for maintaining a sign in violation of the Texas Highway Beautification Act and its implementing regulations. CR.3-8.[1] AusPro asserts, as affirmative defenses, that the statute and regulations violate the Fourteenth Amendment's incorporation of the First Amendment right to free speech and Article I, § 8 of the Texas Constitution. CR.14.

*Trial Court*:    The Honorable Timothy J. Sulak
345th District Court, Travis County, Texas

*Course of Proceedings*:    The parties agreed to stipulated facts, *see* CR.52-55, and the trial court conducted a bench trial.

*Trial Court Disposition*:    The trial court entered final judgment for the Department. It (a) enjoined AusPro from maintaining the illegal sign, (b) awarded a civil penalty of $3,500, and (c) concluded that the statute and regulations were constitutional. CR.107-09. The court later entered findings of fact and conclusions of law. CR.116-17.

---

[1] Citations of the Clerk's Record are formatted "CR.[page]". Citations of the Reporter's Record are formatted "RR.[page]".

## STATEMENT REGARDING ORAL ARGUMENT

AusPro asserts that oral argument is warranted because "this case raises issues of first impression." AusPro Br. xi. To the contrary, as explained below, AusPro's position is materially indistinguishable from the plaintiff's in *Texas Department of Transportation v. Barber*, 111 S.W.3d 86 (Tex. 2003), which upheld the Texas Highway Beautification Act's constitutionality against a free-speech challenge premised on political speech. If the Court decides to hear oral argument, however, the Department wishes to participate.

## ISSUES PRESENTED

This appeal involves two aspects of the Texas Highway Beautification Act (the "Act") and its implementing regulations.[2] First, the Act generally prohibits signs adjacent to, and visible from, certain highways. That ban is subject to various exemptions, however, including one for onsite signs (i.e., signs pertaining to on-premises activities) and another limited one for election-related signs. Second, even if the sign doesn't pertain to onsite activities or election speech, it may be erected in a commercial zone (like AusPro's property) if the owner has obtained a license and permit.

The issues presented are:

1.  Whether the Act's prohibition of offsite signs communicating political speech along highways imposes a valid time, place, and manner restriction.

2.  (a) Whether AusPro forfeited its prior-restraint challenge to the Act's licensing and permitting regulations by failing to raise this complaint in the district court.
    (b) If not, whether those regulations constitute an invalid prior restraint.

3.  Whether the Act and its implementing regulations violate Article I, Section 8 of the Texas Constitution.

---

[2] This brief cites the regulations in effect during the period that is the subject of the Department's enforcement action against AusPro (July through October 2011). *See* CR.54. The 2011 regulations are attached as the appendix to this brief.

No. 03-14-00375

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

AusPro Enterprises, LP,
*Appellant*,
v.
Texas Department of Transportation,
*Appellee*.

On Appeal from the
345th Judicial District Court of Travis County, Texas

**Appellee's Brief**

To the Honorable Third Court of Appeals:

In *Texas Department of Transportation v. Barber*, 111 S.W.3d 86 (Tex. 2003), the Texas Supreme Court upheld the Act's constitutionality against a free-speech challenge premised on political speech. *Barber* thoroughly examined relevant U.S. Supreme Court precedent, all the various exemptions in the Act, and the test for time, place, and manner restrictions. Although AusPro futilely attempts to distinguish *Barber*— and then all but ignores that precedent throughout the opening brief's

discussion of the very issues *Barber* resolved—*Barber* squarely requires rejection of AusPro's arguments about election-related speech.

As to the licensing and permitting regulations, AusPro forfeited its challenge by failing to raise it in the trial court. But even if AusPro had preserved this complaint, its arguments fail on the merits. AusPro misreads the regulations and misstates the appropriate constitutional test. Accordingly, the trial court's judgment should be affirmed.

## STATEMENT OF FACTS

### I. THE TEXAS HIGHWAY BEAUTIFICATION ACT

The Act was passed in response to the federal Highway Beautification Act of 1965, which docks a state ten percent of its share of Federal highway-aid funds if the state does not maintain "effective control" of "outdoor advertising" adjacent to its highways. 23 U.S.C. § 131(b), (c). The Legislature expressly declared the Act's intention to comply with that federal incentive and to advance safety and aesthetics goals. TEX. TRANSP. CODE § 391.002(b) (declaring that purpose of Act is to "promote the health, safety, welfare, morals, convenience, and enjoyment of the traveling public" and to "protect the public investment in the interstate and primary systems"). "Outdoor advertising" includes

2

anything "designed, intended, or used to advertise or inform if any part of the advertising or information content is visible from the main-traveled way of the interstate or primary system." *Id.* § 391.001(10). That definition covers both commercial and noncommercial speech. *Barber*, 111 S.W.3d at 99.

The Act generally prohibits such advertising in two types of areas: (1) "within 660 feet of the nearest edge of a right-of-way if the advertising is visible from the main-traveled way of the interstate or primary system," and (2) "outside an urban area if the advertising is located more than 660 feet from the nearest edge of a right-of-way, is visible from the main-traveled way of the interstate or primary system, and is erected for the purpose of having its message seen from the main-traveled way of the interstate or primary system." TEX. TRANSP. CODE § 391.031(a).

That ban is qualified, however, by several exemptions that "accommodate as much speech as possible and still accomplish the goals of preserving the landscape and promoting travel safety." *Barber*, 111 S.W.3d at 103; *see* TEX. TRANSP. CODE § 391.031(b) (listing six

3

exemptions);[3] 43 TEX. ADMIN. CODE § 21.146(a) ("Exempt Signs"). The basic division between acceptable and forbidden outdoor advertising rests on the location of the property and whether the sign pertains to activities on the property. In noncommercial and non-industrial areas, the Act generally bans offsite speech but "allows all onsite commercial speech and *all* onsite noncommercial speech." *Barber*, 111 S.W.3d at 99. A few exemptions permit even offsite signs in those areas (e.g., directions to natural wonders, *see* TEX. TRANSP. CODE § 391.031(b)(1), and certain

---

[3] Along with the election-sign exemption discussed below, the statute exempts:

"(1) directional or other official outdoor advertising authorized by law, including advertising pertaining to a natural wonder or a scenic or historic attraction;

(2) outdoor advertising for the sale or lease of the property on which it is located;

(3) outdoor advertising solely for activities conducted on the property on which it is located;

(4) outdoor advertising located within 660 feet of the nearest edge of a right-of-way in an area in which the land use:

    (A) is designated industrial or commercial under authority of law; or

    (B) is not designated industrial or commercial under authority of law but the land use is consistent with an area designated industrial or commercial;

(5) outdoor advertising that has as its purpose the protection of life and property; or

(6) outdoor advertising erected on or before October 22, 1965, that the commission, with the approval of the secretary of the United States Department of Transportation, determines to be a landmark of such historic or artistic significance that preservation is consistent with the purposes of this subchapter." *Id.*

4

election-related signs, *see id.* § 391.005), but these "bear a direct relationship to the State's interest in promoting travel safety while minimizing the number of signs" and "accommodate[ing] as much speech as possible." *Barber*, 111 S.W.3d at 103. In commercial and industrial areas, signs bearing both commercial and noncommercial speech are acceptable, "regardless of whether that speech relates to activities on the property," *id.* at 99, provided that the owner obtains a license and permit, as discussed below. The exemptions in the regulations largely track the statutory exemptions, subject to the administrative agency's power to reasonably construe and implement the statute.[4]

---

[4] Effective July 1, 2011, and during the period at issue here, 43 TEX. ADMIN. CODE § 21.146(a) exempted:

"(1) an on-premise sign that meets the criteria provided by §21.147 of this division (relating to On-premise Sign) except as provided by subsection (c) of this section;

(2) a sign that has the purpose of protecting life or property;

(3) a sign that provides information about underground utility lines;

(4) an official sign that is erected by a public officer, public agency, or political subdivision under the officer's, agency's, or political subdivision's constitutional or statutory authority;

(5) a sign required by the Railroad Commission of Texas at the principal entrance to or on each oil or gas producing property, well, tank, or measuring facility to identify or to locate the property if the sign is no larger than necessary to comply with the Railroad Commission's regulations;

(6) a sign of a nonprofit service club, charitable association, religious organization, chamber of commerce, nonprofit museum, or governmental entity that gives

5

information about the meetings, services, events, or locations of the entity and that does not exceed an area of 32 square feet;

(7) a public service sign that:

    (A) is located on a school bus stop seating bench or shelter;

    (B) identifies the donor, sponsor, or contributor of the shelter;

    (C) contains a public service message that occupies at least 50 percent of the area of the sign;

    (D) has no content other than that described by subparagraphs (B) and (C) of this paragraph;

    (E) is authorized or approved by the law of the entity that controls the highway involved, including being located at a place approved by the entity;

    (F) has a sign face that does not exceed an area of 32 square feet; and

    (G) is not facing the same direction as any other sign on that seating bench or shelter;

(8) a sign that shows only the name of a ranch on which livestock are raised or a farm on which crops are grown and the directions to, telephone number, or internet address of the ranch or farm and that has a sign face that does not exceed an area of 32 square feet;

(9) a sign that:

    (A) relates only to a public election;

    (B) is located on private property;

    (C) is erected after the 91st day before the date of the election and is removed before the 11th day after the election date;

    (D) has a sign face that does not exceed an area of 50 square feet; and

    (E) contains no commercial endorsement; and

(10) a sign identifying the name of a recorded subdivision located at an entrance to the subdivision or on property owned by or assigned to the subdivision, home owners association, or other entity associated with the subdivision."

AusPro's challenge focuses on the election-sign exemption, which exempts from the Act "a sign erected solely for and relating to a public election," provided that the sign is maintained only between ninety days before the election and ten days after the election. TEX. TRANSP. CODE § 391.005; *see* 43 TEX. ADMIN. CODE § 21.146(a)(9).[5]

If a sign does not fall within section 391.005 or most of the statutory carve-outs in section 391.031(b), the owner must obtain both a license and a permit from the Department. *See* 43 TEX. ADMIN. CODE §§ 21.144 ("Except as provided by this division, a person may not obtain a permit for a sign under this division unless the person holds a currently valid license . . . ."), 21.146(a) (listing signs "exempt from this division," including election signs). Most relevant to this appeal, a sign in an industrial or commercial zone needs a license and permit. *See, e.g.*, TEX. TRANSP. CODE §§ 391.061(a), 391.067; 43 TEX. ADMIN. CODE § 21.166(a).

The license application requires the applicant's contact information, the location of the sign, a fee, and a surety bond. *See* 43 TEX. ADMIN. CODE § 21.152. The permit application also requires more

---

[5] In 2014, the election-sign exemption in the regulations was moved to paragraph (a)(10), where it currently resides. 39 Tex. Reg. 7954, 7956 (2014).

detailed information about the sign's location and design. *See id.* § 21.159. In reviewing the permit application, Department staff evaluates physical characteristics of the proposed sign but not its content. *See, e.g.*, *id.* §§ 21.182 ("Sign Face Size and Positioning"), 21.189 ("Sign Height Restrictions"), 21.190 ("Lighting of and Movement on Signs").

The penalty for violating the Act is $500-$1000 per offense, where "[e]ach day of the proscribed conduct is a separate offense." *E.g.*, TEX. TRANSP. CODE § 391.031(d).

## II.   AUSPRO'S ILLEGAL SIGN

AusPro owns property along State Highway 71 in Bee Cave, Texas. CR.52. The property is zoned commercial and is occupied by a "funky gift store[]" called Planet K. *Id.* On July 7, 2011, AusPro's owner placed a sign near the building's front porch that contained the text "Ron Paul Revolution," "President," and "RonPaul2012.com." CR.53; *see* CR.58 (photograph of sign). The sign was visible from the highway for at least seven days between July 7 and October 1. CR.53. AusPro conceded that its sign did not fall within the time period specified in the Act's election-

8

sign exemption. CR.54. It also conceded that it did not obtain a license or permit. CR.53.

The Department notified AusPro in July 2011 that its sign violated the Act for failing to satisfy the election-sign exemption or the permitting requirements. CR.59-60. After AusPro failed to remove its sign, the Department brought this enforcement action. CR.3-8. AusPro answered and asserted as affirmative defenses that the Act and its regulations "violate Aus[P]ro's right to free speech" under the United States and Texas Constitutions. CR.14. The trial court held a bench trial based on stipulated facts and rendered final judgment for the Department. CR.107-109; *see* CR.52-55 (stipulated facts).

## SUMMARY OF ARGUMENT

The validity of the Act's general prohibition on signs visible from federally-funded highways turns on whether the Act is content neutral. *Barber* has resolved that inquiry in favor of content neutrality. The Texas Supreme Court considered all the Act's exemptions, including the one for election speech, and concluded that the Act does not favor commercial speech over noncommercial speech and that the exemptions are justified without reference to the content of speech.

9

AusPro attempts to distinguish *Barber* primarily by arguing that *Barber* did not address the election-sign exemption. But AusPro's position is indistinguishable from that of the plaintiff in *Barber*. Both AusPro and Barber erected political signs that didn't pertain to onsite activities, and both argued that the restrictions on such signs were content based and thus unconstitutional. The fact that *Barber* controls this appeal is evident because *Barber* effectively rejected every specific argument AusPro makes here.

Because the Act and its regulations are content neutral, they need satisfy only intermediate scrutiny. *Barber* decided that question as well, finding that the Act and its exemptions were narrowly tailored to advance substantial government interests and left adequate alternatives for property owners along the highways subject to the Act.

As to the licensing and permitting regulations, AusPro forfeited that challenge by not raising it in the trial court. Regardless, the argument fails on the merits. Content-neutral licensing schemes must provide sufficient constraints on the administrator's discretion. The regulations here fulfill that requirement by conditioning the standards on signs' definitive physical characteristics.

Because the Act and its regulations satisfy the First Amendment, they also satisfy the Texas Constitution's free-expression guarantee. AusPro hasn't offered any explanation of Article I, Section 8's text, history, or purpose that would justify a different result for a content-neutral time, place, and manner restriction that targets merely the noncommunicative characteristics of signs.

## ARGUMENT

**I. THE RESTRICTIONS IMPOSED BY THE ACT AND ITS IMPLEMENTING REGULATIONS ARE VALID TIME, PLACE, AND MANNER RESTRAINTS.**

### A. Time, Place, And Manner Restrictions Are Subject To Intermediate Scrutiny.

The right to free speech is not absolute. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) ("[E]ven protected speech is not equally permissible in all places and at all times." (citation and internal quotation marks omitted)). That is particularly true where the method of communication, like a sign or billboard, "combines communicative and noncommunicative aspects," for "the government has legitimate interests in controlling the noncommunicative aspects of the medium." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 502 (1981) (plurality op.); *see id.* at 501 ("Each method of communicating ideas is a law unto

11

itself and that law must reflect the differing natures, values, abuses and dangers of each method." (internal quotation marks omitted)). The State thus may regulate "the time, place, or manner of protected speech, provided [that] the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

As AusPro acknowledges, the crucial question is whether the challenged regulation is content neutral. *See* AusPro Br. 13; *see also, e.g.*, *Barber*, 111 S.W.3d at 98. The law is content neutral if (1) "it is not a regulation of speech," but instead "is a regulation of the places where some speech may occur"; (2) "it was not adopted because of disagreement with the message it conveys"; or (3) "the State's interests . . . are unrelated to the content of the [regulated parties'] speech." *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) (citation and internal quotation marks omitted).

Content-neutral laws are subject only to intermediate scrutiny, not strict scrutiny. *Barber*, 111 S.W.3d at 93. Intermediate scrutiny requires narrow tailoring to significant government interests and adequate alternative methods of communication. *E.g.*, *Ward*, 491 U.S. at 791. *Barber* shows that the Act and its regulations satisfy these time, place, and manner strictures.

## B. *Barber* Controls The Outcome Here.

### 1. *Barber* held that the Act is a valid time, place, and manner restriction.

*Barber* held that the Act satisfies the time, place, and manner test. 111 S.W.3d at 89. Because the Texas Supreme Court effectively rejected every one of the arguments AusPro makes and thereby dictates the result here, we review that opinion in detail.

*Barber* addressed a free-speech challenge from an individual who had erected a sign communicating political speech ("Just say NO to Searches") on his own nonresidential property. *Id.* at 91; *see id.* at 98 (accepting characterization of sign as "political ideological speech"). After reviewing and synthesizing U.S. Supreme Court precedents on time,

13

place, and manner restrictions, *see id.* at 93-98,[6] the Court explained that the threshold question was "whether the Act is content based or content neutral." *Id.* at 98.

As to that crucial threshold issue, the Supreme Court first rejected Barber's argument that regulations burdening "political and ideological speech" are "automatically" reviewed under strict scrutiny; rather, the regulation merely must fit the time, place, and manner framework. *Id.* The Court then turned to Barber's arguments that the exemptions in the Act rendered it content based by "mak[ing] certain distinctions based on subject matter." *Id.* Specifically, Barber asserted that the Act treated commercial speech more favorably than noncommercial speech (the identical attack AusPro advances here) and treated election speech more favorably than other political speech. *Id.*

The Court roundly disagreed, finding instead that the Act "allows all onsite commercial speech and *all* onsite noncommercial speech":

> The Act defines "outdoor advertising" broadly. It includes both commercial and noncommercial speech, encompassing "advertising or information." Further, the Act permits both

---

[6] The Court discussed at length many of the cases AusPro relies on, among others: *Ward*; *Metromedia*; *City of Ladue v. Gilleo*, 512 U.S. 43 (1994); and *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). Throughout AusPro's brief, it fails to acknowledge that *Barber* settled how these cases apply to the Act.

14

> types of speech in noncommercial and non-industrial areas as long as that speech relates to activities on the property. It also permits both types of speech in commercial and industrial areas, regardless of whether that speech relates to activities on the property.

*Id.* at 99 (citing TEX. TRANSP. CODE § 391.001(10)). The Act thus was content neutral because it "permit[ted] commercial and noncommercial speech everywhere that relates to an activity on the property." *Id.* Other courts have agreed that such an onsite/offsite distinction constitutes content neutrality. *See, e.g., Covenant Media of S.C. v. City of N. Charleston*, 493 F.3d 421, 432-35 (4th Cir. 2007); *Messer v. City of Douglasville*, 975 F.2d 1505, 1509 (11th Cir. 1992) (cited in *Barber*); *Wheeler v. Comm'r of Highways*, 822 F.2d 586, 590-91 (6th Cir. 1987) (cited in *Barber*).

Addressing the election-speech exemption, the Court conceded that it was "arguably content based" by favoring such speech over Barber's non-election-related political speech. *Barber*, 111 S.W.3d at 100. Nonetheless, that exemption "serves purposes unrelated to the content of expression" and consistent with the overall goals of the Act. *Id.*; *cf. Citizens United v. FEC*, 558 U.S. 310, 334 (2010) ("It is well known that the public begins to concentrate on elections only in the weeks

15

immediately before they are held. There are short timeframes in which speech can have influence."). So that exemption, too, did not disturb the Act's content neutrality.

In sum, the Act and its exemptions "bear a direct relationship to the State's interest in promoting travel safety while minimizing the number of signs along a narrow federal corridor." *Barber*, 111 S.W.3d at 103. The exemptions also "accommodate as much speech as possible and still accomplish the goals of preserving the landscape and promoting travel safety." *Id.* The Act as a whole is content neutral.

Applying intermediate scrutiny, the Supreme Court upheld the Act. First, "aesthetics and public safety on the highway are recognized as substantial governmental goals." *Id.* at 103. Second, the Act was narrowly tailored to those goals because it restricted speech only "in non-industrial and noncommercial areas to that which relates to an on-premise activity or to an upcoming public election." *Id.* Third, for that same reason, the Act left open "adequate alternative avenues for communication." *Id.* at 104-05. To that end, the Court expressly rejected the argument that Barber's alternatives were inadequate because they would not allow his sign on his own property. *Id.* at 104.

### 2. AusPro's purported distinctions of *Barber* are meritless.

AusPro cannot escape *Barber*, for AusPro's sign is illegal for precisely the same reason Barber's sign was illegal: Each sign falls within section 391.031(a)'s broad prohibition of signs adjacent to and visible from state highways, and each sign contains noncommercial, political speech that does not fit within any of the Act's exemptions. AusPro offers a potpourri of distinctions, but each is wrong, irrelevant, or both. *See* AusPro Br. 11-13.

*First*, AusPro mainly tries to distinguish *Barber* on the grounds that AusPro is challenging the election-sign exemption itself, whereas Barber's sign "was governed by the Act's general prohibition on signs rather than by [the election-sign] exemption." AusPro Br. 11-12. AusPro misunderstands how the statute operates. The election-sign exemption, section 391.005, does not bar AusPro's sign. The exemption is just that: an *exemption*. Section 391.005 does not ban anything at all; rather, it saves potential offenders from the general ban. In other words, AusPro's sign is illegal not because of section 391.005 but because of section 391.031(a). Neither AusPro nor Barber met the election-sign exemption—AusPro because of the durational limits and Barber because

17

it was not "erected solely for and relating to a public election." TEX. TRANSP. CODE § 391.005. Both signs communicated political speech unrelated to onsite activities within the geographic area covered by the Act.

The key point is that if section 391.005 were stricken from the books, AusPro's sign would still violate the Act. And *Barber* makes clear that the Legislature acted within constitutional limits banning offsite, political signs. The fact that the Legislature decided to allow some offsite speech in the form of election speech during a few months of the year doesn't mean that the Legislature had to allow that speech during the entire year. Indeed, if political speech had that kind of special status, the plaintiff in *Barber* would have won. *Cf. Barber*, 111 S.W.3d at 98.

*Second*, AusPro asserts that *Barber*'s comments that the election-sign exemption does not render the Act content-based were dicta. AusPro Br. 12. That is both wrong and irrelevant. The *Barber* plaintiff contended that the Act was not content neutral because the election-sign exemption favored election-related speech over other speech. 111 S.W.3d at 100. Exemptions that do not cover the plaintiff are without doubt pertinent to free-speech challenges because they might undermine the argument that

18

the statute's restrictions are *not* justified without reference to the content of the restricted speech. *See, e.g.*, *Hill*, 530 U.S. at 723 ("[A] statute that restricts certain categories of speech only lends itself to invidious use if there is a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute's scope, while others fall inside."); *City of Ladue v. Gilleo*, 512 U.S. 43, 50-51 (1994) (stating that constitutional challenge might succeed if "the measure in effect restricts too little speech because its exemptions discriminate on the basis of the signs' messages"). To hold that the Act was content neutral and subject to intermediate scrutiny, the Supreme Court necessarily had to address and reject Barber's argument about the election-sign exemption. And AusPro's point is irrelevant because, as just discussed, AusPro is injured not by section 391.005 but by section 391.031(a).

*Third*, AusPro notes that its affirmative defenses include a facial challenge, while Barber brought only an as-applied challenge. AusPro Br. 13. That is true but meaningless. AusPro's argument misconceives the function of a facial challenge. In the First Amendment context, a facial challenge in the form of "the overbreadth doctrine enables litigants 'to

19

challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Hill*, 530 U.S. at 731-32 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).[7] But AusPro does not and cannot identify how the Act "applies to any conduct more likely to be protected by the First Amendment than [its] own [election] sign[]." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984). Indeed, the entire thrust of AusPro's brief is that its speech deserves the very highest protection of all.

What highlights the hollowness of the facial versus as-applied distinction in this case is that AusPro can't explain how the analysis in *Barber* differs from the analysis of its purported facial attack. AusPro's inability to do so is unsurprising in light of the discussion *infra* Part I.C, which shows that *Barber* addressed and rejected every one of AusPro's

---

[7] A facial challenge therefore also implicates a court's remedy in the same way: if a narrowing construction is impossible and severing is unavailable, the court invalidates even the part of the statute that could be validly applied to the plaintiff's conduct.

20

own arguments. Accordingly, even if AusPro could somehow distinguish *Barber*'s precise holding, the Supreme Court's discussion of the relevant issues would still require affirmance.

## C. Intermediate Scrutiny Governs AusPro's Challenge.

*Barber* forecloses AusPro's efforts to paint the Act's and its regulations' exemptions as content based. AusPro presses a number of arguments in an effort to have this Court apply strict scrutiny, but each one is squarely refuted by *Barber*.

*First*, AusPro asserts that the "election sign exemption is content based because the content of a sign determines how long it may be displayed." AusPro Br. 19. To the extent that the election-sign exemption is "arguably content based," *Barber*, 111 S.W.3d at 100, it is because the exemption favors election speech over non-election political speech. AusPro can't complain about that. And even so, *Barber* held that section 391.005 does *not* make the Act content based because this exemption "serves purposes unrelated to the content of expression [and] is [thus] deemed neutral." *Id.* (citation and internal quotation marks omitted).

More importantly, as already discussed, it's not the election-sign *exemption* that bars AusPro's sign. *See supra* 17-18. The prohibition

derives instead from Transportation Code section 391.031(a). The various lines drawn by the Act's exemptions—including the one for certain election signs—were considered and approved by *Barber* as being content neutral.

AusPro's discussion of the case law on this point completely omits *Barber*. *See* AusPro Br. 19-26. AusPro instead mistakenly relies on cases from other jurisdictions or U.S. Supreme Court cases that predate *Barber*. And many of those U.S. Supreme Court opinions—*City of Ladue*, *Metromedia*, and *Discovery Network*—were discussed in detail in *Barber*, which explained why those decisions supported the Texas Supreme Court's holding that the Act is constitutional.[8] AusPro simply cannot evade the Texas Supreme Court's binding precedent.

The one post-*Barber* opinion that AusPro cites, *United States v. Stevens*, 559 U.S. 460 (2010), is easily distinguishable. *See* AusPro Br. 25. *Stevens* invalidated a federal law that criminalized the depiction of

---

[8] *Barber* even distinguished some of the non-U.S. Supreme Court cases that AusPro discusses. *Compare, e.g.*, AusPro Br. 18 n.5 (citing *Rappa v. New Castle Cnty.*, 18 F.3d 1043 (3d Cir. 1994); *John Donnelly & Sons v. Campbell*, 639 F.2d 6 (1st Cir. 1980); *Union City Bd. of Zoning v. Justice Outdoor Displays, Inc.*, 467 S.E.2d 875 (Ga. 1996)), *with Barber*, 111 S.W.3d at 102 & nn.93-95 (stating that "cases from other jurisdictions suggesting otherwise [i.e., that the Act is content based] are distinguishable" and citing, among others, *Rappa*, *John Donnelly*, and *Union City*).

animal cruelty. 559 U.S. at 464. Unlike the Act, that law *"explicitly regulate[d] expression based on content." Id.* at 468 (emphasis added). *Barber* forecloses any similar characterization of the Act and its exemptions.

And the cases that AusPro emphasizes from other jurisdictions (all of which predate *Barber*) that *Barber* itself did not address are distinguishable because the laws there didn't prohibit the challenger's political speech as a result of an onsite/offsite distinction like the Act does.[9] And even if they were not distinguishable, this Court must of course follow the Texas Supreme Court.

---

[9] *See Whitton v. City of Gladstone, Mo.*, 54 F.3d 1400, 1404 (8th Cir. 1995) (explaining that sign code allowed "permanent year around ground sign expressing support for a particular sports team," while imposing time limits on "identical sign . . . advocating a particular candidate for political office"); *Nat'l Adver. Co. v. Town of Babylon*, 900 F.2d 551, 554 n.1, 556-57 (2d Cir. 1990) (invalidating ordinance that limited sign content to commercial messages); *Knoeffler v. Town of Mamakating*, 87 F. Supp. 2d 322, 327 (S.D.N.Y. 2000) (finding that ordinance favored "commercial signs over non-commercial signs" by allowing on-site advertising while imposing time limits on and requiring permit for noncommercial signs); *Curry v. Prince George's Cnty., Md.*, 33 F. Supp. 2d 447, 448-49 (D. Md. 1999) (addressing ordinance imposing ban on campaign and public-interest signs at private residences, without any indication of an onsite/offsite distinction for all speech); *McCormack v. Twp. of Clinton*, 872 F. Supp. 1320, 1324 (D.N.J. 1994) (mem. op.) (invalidating ordinance that "obviously favors commercial speech" by applying limits only to political speech); *City of Antioch v. Candidates' Outdoor Graphic Serv.*, 557 F. Supp. 52, 58 (N.D. Cal. 1982) (mem. op.) ("Commercial speech, although subject to other limitations in the city's municipal sign ordinance, is merely regulated in Antioch; political speech is outlawed except during the sixty day period before an election."); *Orazio v. Town of N. Hempstead*, 426 F. Supp. 1144, 1148 (E.D.N.Y. 1977) (invalidating time limits on "political wall signs affixed to a candidate's campaign headquarters" that did not likewise apply to "non-

*Second*, AusPro argues that the election-sign exemption impermissibly "favors certain forms of commercial and other speech over election speech" by "singl[ing] out election speech for durational limitations not applicable to other topics of speech." AusPro Br. 26. That argument misreads the statute and (once again) wholly ignores *Barber*.

The Act treats election speech no worse than it treats commercial and other noncommercial speech. As *Barber* explained, "the Act allows all onsite commercial speech and *all* onsite noncommercial speech." 111 S.W.3d at 99. Had AusPro's sign pertained to some activities on its property, the sign would not have violated the Act—because it would have constituted "outdoor advertising solely for activities conducted on the property on which it is located." TEX. TRANSP. CODE § 391.031(b)(3); *see Barber*, 111 S.W.3d at 99 (holding that the Act allows all types of speech "as long as that speech relates to activities on the property").

---

political wall signs which 'advertise the nature of the business being conducted on those premises'"); *City of Painesville Bldg. Dep't v. Dworken & Bernstein Co., L.P.A.*, 733 N.E.2d 1152, 1158 (Ohio 2000) (invalidating zoning code provision that placed time limits on residential, political sign but not "upon any other category of signs"); *Collier v. City of Tacoma*, 854 P.2d 1046 (Wash. 1993) (en banc) (addressing citywide time limits on political signs (including residential signs), where "on-site commercial signs" were treated more favorably).

24

In support of its argument, AusPro gives an example where a sign saying "Buy Your Ron Paul Bumper Stickers Here" would satisfy the Act even though its "Ron Paul Revolution" sign would not. AusPro Br. 26-27. But that bumper-sticker sign would comply not because the Act favors commercial speech, but because it favors onsite speech. Again, as *Barber* explained, the Act "regulates signs based on their location" and "does not favor commercial speech over noncommercial speech." 111 S.W.3d at 102. Notably, the Supreme Court dismissed another example nearly identical to AusPro's: "[R]ural property owners that do not live on their property would be permitted to display a sign saying, 'Watermelons for sale' if they erected a fruit stand on the property, but they would not be permitted to display a sign expressing their political views." *Id.* at 104. AusPro's example is equally unpersuasive for the same reason.

Moreover, the limited content examination necessary to determine whether a sign relates to on-premises activities does not make the statute content based. *See, e.g.*, *Hill*, 530 U.S. at 721 (in holding that regulation was content neutral, stating, "[w]e have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct");

*Covenant Media*, 493 F.3d at 434 (approving of onsite/offsite distinction and holding, "[t]o the extent that the Sign Regulation required looking generally at what type of message a sign carries to determine where it can be located, this 'kind of cursory examination' did not make the regulation content based" (quoting *Hill*, 530 U.S. at 721)).

The Department acknowledges that *Barber* described the regulations' definition of an onsite sign as "constitutionally suspect" because it limited the onsite exemption to commercial signs. 111 S.W.3d at 100; *see* 43 TEX. ADMIN. CODE § 21.147(a) (defining "on-premise sign").[10] The potential infirmity of section 21.147 does not help AusPro for three reasons. First, as discussed, the Act itself prohibits AusPro's sign and thus provides a valid basis for the Department's enforcement action. Second, the allowance for onsite signs expressing noncommercial speech wouldn't have saved AusPro's sign because its sign didn't pertain to onsite activities. Accordingly, section 21.147's limits are irrelevant. *Cf. Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 598

---

[10] At the time *Barber* was decided, section 21.147 limited onsite signs to those that refer to "commercial" activity. The 2011 version deleted "commercial," but still limited such signs to identifying "a business" or its "products or services." 43 TEX. ADMIN. CODE § 21.147(a)(1).

26

(5th Cir. 2010) (holding that, in First Amendment facial challenge, "plaintiff must establish injury under a particular provision of a regulation that is validly applied to its conduct, then assert 'a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court *under that provision*' (citation omitted)); *Covenant Media*, 493 F.3d at 429-30 (holding that invoking the term "facial challenge" "does not provide [a litigant] a passport to explore the constitutionality of every provision of the Sign Regulation"). Third, in all events, even if the Court were to find section 21.147(a) unconstitutional (despite its uselessness for AusPro), the proper remedy would be to sever the offending provision, which would avoid any chilling effect of that section's commercial limitation. *See* TEX. GOV'T CODE § 311.032(c).[11] Even with the regulations' problematic definition of on-premise sign excised, AusPro's sign remains illegal.

Although it's true that a few exemptions allow certain other signs pertaining to offsite activities (such as directional signs), *Barber*

---

[11] Severing is appropriate in the First Amendment context. *See, e.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501, 506 & n.14 (1985); *cf. Covenant Media*, 493 F.3d at 438 (noting "principle that invalidating a whole statute may nullify more of the work of the people's elected representatives than is constitutionally necessary").

27

considered that issue as well. The Supreme Court held that those exemptions "bear a direct relationship to the State's interest in promoting travel safety while minimizing the number of signs along a narrow federal corridor," and thus did not render the Act non-content-neutral. *Barber*, 111 S.W.3d at 103. AusPro's complaint that some exemptions allow non-election speech year-round thus fails. AusPro Br. 27-28. The exemptions either fit within the onsite/offsite distinction that *Barber* expressly approved or otherwise are "'*justified* without reference to the content of the regulated speech.'" *Barber*, 111 S.W.3d at 100 (quoting *City of Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986)).

AusPro's sign highlights the permissible manner in which the Act and its regulations operate. The Act does not prohibit erecting election signs per se. It merely prohibits offsite signs in certain locations, i.e., adjacent to, and visible from, certain highways. The fact that AusPro's sign in its current form might not legally be placed anywhere else on AusPro's property doesn't reveal a legislative judgment about the value of its content, but only the physical, noncommunicative characteristics of the sign, as well as the location of the property. As *Barber* holds, that kind of judgment does not trigger strict scrutiny.

AusPro responds that this "secondary effects" analysis does not apply to political speech, AusPro Br. 38-42, but as discussed above, *Barber* held otherwise. The Court expressly stated that the Act generally "control[s] the secondary effects of billboards and signs along the interstate and primary highway system." *Barber*, 111 S.W.3d at 100. And as to the Act's various exemptions, it agreed with the Sixth Circuit's conclusion regarding a similar statute that the Act is "'not directed at the content of the messages, but at their secondary effects.'" *Id.* at 101 (quoting *Wheeler*, 882 F.2d at 590). And, again, Barber, like AusPro, also premised his claim on political speech. *Id.* at 100. *Barber* thus once more forecloses AusPro's position.

*Third*, citing the U.S. Supreme Court's opinion in *City of Ladue*, AusPro argues that strict scrutiny applies to any restriction of speech on one's own property. AusPro Br. 34. AusPro again runs headlong into *Barber*: "[T]he special concerns the Supreme Court noted in *City of Ladue* about prohibiting an individual from displaying signs in the yards or windows of their homes do not apply here." 111 S.W.3d at 104; *cf., e.g., City of Ladue*, 512 U.S. at 55, 58 (expressing concern about *"residential* signs [being] an important and distinct medium of expression" and noting

29

"special respect for individual liberty in the *home*" (emphases added)). AusPro for once acknowledges that *Barber* addressed this issue, but remarkably cites only the *dissent*, completely ignoring the majority's holding on this same point. *See* AusPro Br. 34.

*Fourth*, AusPro contends that strict scrutiny applies because highways "have long been recognized as quintessential public fora for assembly and debate." AusPro Br. 35. Were that so, *Barber* would have come out the other way. Once more, AusPro wholly disregards *Barber*'s existence.

*Finally*, relying mainly on *Citizens United v. FEC*, AusPro obliquely suggests that restrictions on political speech always merit strict scrutiny. AusPro Br. 30-33. *Citizens United* did apply strict scrutiny, but that case addressed what was unquestionably a content-based regulation: an outright ban on electioneering communications. 558 U.S. at 318-19. Neither *Citizens United* nor any other case changed the rule that "regulations involving noncommercial speech—which includes political and ideological speech—can be subject to intermediate scrutiny if they are content neutral." *Barber*, 111 S.W.3d at 98. That much is clear from subsequent U.S. Supreme Court cases, which have reaffirmed the

principle that "'[e]ven protected speech is not equally permissible in all places and at all times'" but instead "is 'subject to reasonable time, place, or manner restrictions.'" *Snyder v. Phelps*, 131 S. Ct. 1207, 1217-18 (2011) (addressing speech that "highlight[ed]" "political" issues of "public import") (quoting *Clark*, 468 U.S. at 293); *see also, e.g., Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376 (4th Cir. 2013) (applying intermediate scrutiny to law that burdened political speech).

AusPro evidently recognizes this facet of *Citizens United* by arguing only that a "[c]ontent-[b]ased" restriction of political speech triggers strict scrutiny. AusPro Br. 29. As discussed above, and as *Barber* holds, the Act is content neutral. Further, the general rule noted in *Barber* is a sensible one. If every law that somehow burdened political speech—even as part of a content-neutral, time, place, and manner restriction of noncommunicative aspects of conduct—were subject to strict scrutiny, then, in light of the extraordinary hurdle that strict scrutiny imposes, nearly every speech restriction in the country would fall (at least to an as-applied challenge). That is not the law.

## D. The Act And Its Regulations Pass Intermediate Scrutiny.

Content-neutral time, place, and manner restrictions must be (1) narrowly tailored to serve (2) substantial government interests, and (3) must leave open adequate alternative means of communication. *See, e.g.*, *Ward*, 491 U.S. at 791. *Barber* easily resolves those inquiries for this appeal.

First, "aesthetics and public safety on the highway are recognized as substantial governmental goals." *Barber*, 111 S.W.3d at 103. AusPro does not argue otherwise. *Cf.* CR.53-54 (stipulating that the purpose of the "Act is to control the secondary effects of billboards and signs along the interstate and primary highway system such as stemming visual clutter on the landscape and promoting travel safety").

Second, the Act is "sufficiently narrowly tailored" because it "accommodate[s] as much speech as possible and still accomplish[es] the goals of preserving the landscape and promoting travel safety." *Barber*, 111 S.W.3d at 103-04. As *Barber* explained, noncommercial speech is permitted (1) in industrial and commercial areas, regardless of whether it pertains to onsite activities, (2) in all areas as long as it does relate to onsite activities, and (3) everywhere not adjacent to and visible from

32

highways. *Id.* at 103. Once again, AusPro ignores *Barber*'s holding on this point.

Moreover, as applied to election speech, the Act is even more lax, for it allowed AusPro's sign during the critical "weeks immediately before [elections] are held," the time period during which "[i]t is well known that the public begins to concentrate on elections." *Citizens United*, 558 U.S. at 334. Because the Act is narrowly tailored as applied to non-election, noncommercial speech, then *a fortiori* it is narrowly tailored as applied to election speech.

Third, for largely the same reasons, the Act supplies sufficient alternative methods of communication. *Barber*, 111 S.W.3d at 104-05. AusPro argues that the sign couldn't be placed anywhere else on the property, that AusPro doesn't own any other property along Highway 71, and that AusPro wanted to inform people travelling along that highway specifically. AusPro Br. 38. Those same arguments were made by the plaintiff in *Barber*, and the Supreme Court rejected each one. *See* 111 S.W.3d at 104-05. Once again, *Barber* is fatal to AusPro's position, despite AusPro's failure even to acknowledge the opinion's discussion of the adequacy of alternatives. And here AusPro stipulated that it places

political signs on its other properties, CR.53, showing that it has successfully availed itself of the types of opportunities *Barber* explained remain open.

It is no response that *Barber* didn't specifically address narrow tailoring or adequate alternatives regarding election speech, but only non-election political speech. Because section 391.005 allows election signs during part of the year, AusPro has more opportunities to engage in its election speech than the plaintiff in *Barber* had for his non-election speech. *Barber* requires affirmance.

## II. THE PERMITTING AND LICENSING REGULATIONS ARE ALSO CONTENT NEUTRAL AND THUS NOT UNCONSTITUTIONAL PRIOR RESTRAINTS.

AusPro's sign also violated the Act because AusPro had not secured a license and permit. *See* TEX. TRANSP. CODE §§ 391.061, 391.067. Although AusPro wouldn't have needed a permit had it complied with the election-sign exemption, *see id.* § 391.005 (providing that "[t]his chapter does not apply to" signs meeting the election-sign exemption), it also could have availed itself of the Act's separate allowance for signs erected in industrial or commercial areas, provided that their owners have a license and permit, *see* TEX. TRANSP. CODE § 391.031(b)(4); *cf.* CR.52

34

(stipulation that AusPro's property "is zoned for commercial use").[12] The licensing and permitting regulations, like the rest of the Act, are content neutral, and consequently satisfy the relevant constitutional test.

## A. AusPro Forfeited Its Challenge To The Licensing And Permitting Regulations.

In the trial court, AusPro never complained that the licensing and permitting regulations constitute an invalid prior restraint. It instead argued its challenge as a complete ban on political speech. *See, e.g.*, CR.68 (stating that the Act "is an outright ban on political speech"); RR.26 (counsel arguing that the Act "is a strict prohibition on political speech").[13] What's more, AusPro's trial brief focused exclusively on the Act's election-sign exemption and never even mentioned or cited *any* of the Department's regulations, let alone the permitting and licensing

---

[12] AusPro questions whether, had it applied for a permit, one could have been issued "for a sign that does not fall within the election sign exemption or any other exemption under the Act, and, in AusPro's case, that [the Department] has already deemed 'illegal.'" AusPro Br. 49. AusPro misreads the statute and the Department's enforcement letter. As noted above, a separate allowance exists for signs in industrial and commercial areas. And the Department characterized the sign as "illegal" because AusPro did not have a permit. CR.10. That characterization in no way suggests that the Department would have denied AusPro a permit for the same sign at the same location.

[13] Even when the permitting process came up during the hearing, AusPro's counsel didn't pursue the issue. *See, e.g.*, RR.22-23.

regulations in particular. AusPro has therefore forfeited its prior-restraint challenge to those regulations. *See, e.g.*, TEX. R. APP. P. 33.1(a); *Tex. Dep't of Pub. Safety v. Garcia*, 327 S.W.3d 898, 903 (Tex. App.—Austin 2010, pet. denied) ("The Department has waived the argument that section 163.435 of the Revised Oregon Statutes is substantially similar to section 43.25 of the penal code by not raising it in the district court.").

That AusPro generally asserted a First Amendment challenge is insufficient to preserve its prior-restraint complaint. *Cf.* AusPro Br. 49 n.9. A licensing or permitting prior restraint poses a "different constitutional harm[]" than an outright ban on expressive conduct. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 762-64 (1988) (discussing "the different concerns animating our test to determine whether an expressive activity may be banned entirely, and our test to determine whether it may be licensed in an official's unbridled discretion"). As *City of Lakewood* indicates, and as AusPro's briefing and the discussion below demonstrate, the prior-restraint objection comprises an independent complaint within the meaning of Appellate Rule 33.1(a).

The trial court cannot be reversed based on a theory that was never presented to it.

**B.    Regardless, AusPro's Prior-Restraint Challenge Is Meritless.**

As with outright bans on speech, the appropriate test of a licensing or permitting scheme turns on whether it is content neutral. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321-23 (2002). Content-based prior restraints must satisfy the three requirements enunciated in *Freedman v. Maryland*, 380 U.S. 51 (1965): "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Thomas*, 534 U.S. at 321 (citation and internal quotation marks omitted)). AusPro erroneously suggests that all prior restraints must meet those standards. AusPro Br. 54-55. To the contrary, content-neutral time, place, and manner regimes need only "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323; *see, e.g.*, *Lauder, Inc. v. City of Houston, Tex.*, 670 F.3d 664, 665 (5th Cir. 2012) (per curiam) (holding

37

that judicial review is not required); *Granite State Outdoor Adver., Inc. v. City of St. Petersburg, Fla.*, 348 F.3d 1278, 1281-83 (11th Cir. 2003) (same). The Department's regulations are content neutral and sufficiently constrain official discretion.

### 1. The licensing and permitting regulations are content neutral.

The Department generally requires licenses and permits for signs only in industrial and commercial zones. *See* TEX. TRANSP. CODE § 391.032(a) (providing that the Department "by rule may regulate the orderly and effective display of outdoor advertising consistent with the customary use of outdoor advertising in this state in" commercial and industrial areas); 43 TEX. ADMIN. CODE § 21.146(a) (exempting from regulations signs matching Transportation Code section 391.031(b)'s categories, but not signs in industrial or commercial areas); *id.* § 21.166(a) (providing that the Department will issue a permit only to signs in commercial and industrial areas). That distinction is plainly based on location, not on content, and AusPro has not argued otherwise. Moreover, the regulations condition the award of a license or permit on physical characteristics of the proposed sign, not its content. *See, e.g., id.* §§ 21.152-21.153 (license application and issuance), 21.182 ("Sign Face

38

Size and Positioning"), 21.189 ("Sign Height Restrictions"), 21.190 ("Lighting of and Movement on Signs").

Of the various regulatory provisions governing the licensing and permitting process, AusPro objects to only two of them as drawing content-based lines. AusPro Br. 56-58 (discussing 43 TEX. ADMIN. CODE §§ 21.149, 21.153(b)). Its arguments about each provision fail for two reasons: (1) AusPro misreads both provisions, and (2) even if it correctly interpreted the regulations, the flaws wouldn't shield AusPro from the Department's enforcement action.

AusPro first complains about section 21.153(b), which provides: "The department will not issue a license to an entity that is not authorized to conduct business in this state." 43 TEX. ADMIN. CODE § 21.153(b); *see* AusPro Br. 56. Without explanation, AusPro asserts that this provision "favor[s] commercial speech." *Id.* at 58. Evidently AusPro thinks that only entities that "conduct business" may obtain licenses. But that is not what section 21.153(b) says. Rather, section 21.153(b) excludes certain entities—foreign corporations, essentially—from obtaining licenses. That section does not say, "The Department will issue licenses only to entities authorized to conduct business in this State." To the

contrary, any "person" may apply for a license. 43 TEX. ADMIN. CODE § 21.152(a). And the regulations define "person" as "[a]n individual, association, partnership, limited partnership, trust, corporation, or other legal entity." *Id.* § 21.142(14). The regulation accordingly does not "favor commercial speech" and is content neutral.

Next, AusPro targets section 21.149, which requires that certain nonprofit signs advertise only the nonprofit itself or onsite activities. *Id.* § 21.149(b). AusPro concludes that, as a result, "noncommercial speech is not permitted unless otherwise exempted." AusPro Br. 57. But those limits apply only if the nonprofit wants to take advantage of section 21.148's exemption from the license requirement. *See* 43 TEX. ADMIN. CODE § 21.148 ("A nonprofit organization *may* erect or maintain a nonprofit sign without obtaining an outdoor advertising license, but the organization *must obtain a permit under* § 21.149 . . . ." (emphases added)). If the nonprofit wants to post content other than that listed in section 21.148, it can do so simply by going through the licensing process. Section 21.149 therefore does not render the regulations content based.

In all events, even if AusPro correctly interpreted sections 21.153(b) and 21.149, they are irrelevant to its defense. As to section 21.153(b),

40

AusPro is not an "entity that is not authorized to conduct business in this state." *Id.* § 21.153(b). Accordingly, it is not injured by that provision. Likewise, AusPro is not a nonprofit, so any content limit imposed by section 21.149(b) would not have harmed it. Addressing the constitutionality of those provisions would thus result in what amounts to an advisory opinion. *Cf. Serv. Emps. Int'l Union*, 595 F.3d at 598 (holding that, in First Amendment facial challenge, "plaintiff must establish injury under a particular provision of a regulation that is validly applied to its conduct, then assert 'a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court *under that provision*' (citation omitted)); *Covenant Media*, 493 F.3d at 429.

Furthermore, AusPro can't argue that the permitting regulations must be invalidated in toto because the Court would be obligated to sever only the offending provisions (i.e., sections 21.149 and 21.153(b)). *See* TEX. GOV'T CODE § 311.032(c). The remaining provisions would easily comprise a functioning licensing and permitting scheme that regulates only signs' physical characteristics. *Cf. Covenant Media*, 493 F.3d at 438 (noting "principle that invalidating a whole statute may nullify more of

41

the work of the people's elected representatives than is constitutionally necessary").

### 2. The regulations contain adequate standards to control official discretion.

Because the regulations are content neutral, they need only "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. AusPro doesn't expressly argue that the regulations fail to provide those standards. Instead, it contends that the regulations are "bewildering," "byzantine," and "arcane." AusPro Br. 52-54. That is pure hyperbole.

The regulations broadly require the applicant's contact information, the location of the property, the location of the sign, the design of the sign, a fee, and a surety bond. *E.g.*, 43 TEX. ADMIN. CODE §§ 21.152 ("License Application"), 21.159 ("Permit Application"). The Department respectfully disagrees that those requirements are perplexing or that gathering that information is unduly burdensome.

Regardless, those requirements don't leave any discretion in the hands of the administrator. Section 21.153(a) plainly states that a license "*will* issue . . . if the requirements of § 21.152 . . . are satisfied." *Id.* § 21.153(a) (emphasis added). In turn, section 21.152 requires the

42

applicant's contact information, the county where the sign will be maintained, a surety bond, a power of attorney from the surety company, and a license fee. *Id.* § 21.152. There is not an ounce of "unbridled discretion" in those terms.

The permit standards are similarly constrained. Section 21.163 states that the Department "will review the permit application for completeness and compliance with all the requirements of this division." *Id.* § 21.163(d). AusPro obliquely implies that this leaves some room for administrator interpretation, but it can't point to any provision of the regulations that might allow the administrator to engage in any content or viewpoint censorship. *See* AusPro Br. 53. The regulations require evaluation only of physical characteristics of the signs, like size, height, and positioning. *See, e.g.*, 43 TEX. ADMIN. CODE §§ 21.182, 21.189.

AusPro further complains that the regulations don't provide an "ultimate deadline" for a permitting decision. AusPro Br. 53. The 2011 regulations promise a decision within 45 days, but if the decision cannot be made within that timeframe, "the department will notify the applicant of the delay and provide the reason for the delay and provide an estimate for when the decision will be made." 43 TEX. ADMIN. CODE § 21.164(a). A

strict deadline is unnecessary in a content-neutral permitting scheme. *See, e.g.*, *Granite State*, 348 F.3d at 1281-82 (rejecting argument that "lack of specific time limits confers excessive discretion" and holding that any "'abuse must be dealt with if and when a pattern of unlawful favoritism appears'"); *S. Or. Barter Fair v. Jackson Cnty., Or.*, 372 F.3d 1128, 1138 (9th Cir. 2004) (holding that content-neutral regulation "need not include either a deadline for consideration by the governing body or a provision for prompt judicial review").

These latter two points highlight the unfairness of AusPro's failure to raise its prior-restraint challenge in the trial court. Even if the standards and time limits weren't constitutionally sufficient on their face, the U.S. Supreme Court has explained that where "a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits. That rule applies even if the face of the statute might not otherwise suggest the limits imposed." *City of Lakewood*, 486 U.S. at 770 n.11; *see also, e.g.*, *Ward*, 491 U.S. at 795 (holding that city policy sufficed to impose standards "[e]ven if the language of the guideline were not sufficient on its face"); *Bloedorn v. Grube*, 631 F.3d 1218, 1237 (11th Cir.

44

2011) ("We consider the actual policies and practices employed by the University, not just the [permitting] policy's text."). The Department wasn't on notice that it needed an affidavit or other evidence from its staff regarding its implementation of the permitting scheme, and the trial court had no reason to think it needed to consider this issue.

AusPro also complains about the fee requirements, AusPro Br. 53, but "there is nothing unconstitutional in a [government's] charging a fee." *S. Or. Barter Fair*, 372 F.3d at 1139.

AusPro's final argument is that the regulations are unconstitutional for failing to provide for judicial review. AusPro Br. 54-55. But as explained above, content-neutral permitting schemes need not do so. *See supra* at 37-38; *see also, e.g.*, *Lauder*, 670 F.3d at 665 ("As a content-neutral time, place, and manner restriction that does not leave enforcing officials with unbridled discretion, the newsrack ordinance need not contain an explicit provision for judicial review."). That principle is unsurprising given the consequences of the alternative: if every licensing regime that even indirectly burdened speech required a judicial outlet, the courts could be overwhelmed. The Department's regulations pass constitutional muster.

## III. THE ACT AND ITS REGULATIONS DO NOT VIOLATE THE TEXAS CONSTITUTION.

Because the Act and its regulations satisfy the First Amendment to the U.S. Constitution, they also satisfy the Texas Constitution's free-expression guarantee. *See* TEX. CONST. art. I, § 8. AusPro offers no reason why the Texas Constitution would invalidate a content-neutral, time, place, and manner restriction of expressive conduct that also includes noncommunicative characteristics.

"'Article I, Section 8 *may* be more protective of speech in some instances than the First Amendment, but if it is, it must be because of the text, history, and purpose of the provision, not just simply *because*.'" *Kinney v. Barnes*, 443 S.W.3d 87, 92 (Tex. 2014) (quoting *Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546, 559 (Tex. 1998)). Accordingly, "a party claiming that the Texas Constitution offers greater free-speech protection must explain how the text, history, or purpose of the state constitution supports that argument." *Tex. Entm't Ass'n v. Combs*, 431 S.W.3d 790, 801 (Tex. App.—Austin 2014, pet. denied). "'The mere assertion that the state provision is broader than the federal *means nothing* . . . .'" *Id.* (quoting *Bentley v.*

46

*Bunton*, 94 S.W.3d 561, 578 (Tex. 2002)). AusPro offers nothing but "bare assertions" to support its claim under the Texas Constitution. *Id.*

As to the Act's ban of offsite noncommercial speech (including political speech), *Barber* already decided that this prohibition does not violate the Texas Constitution. *See* 111 S.W.3d at 106. As AusPro does throughout its brief, it again pretends that *Barber* doesn't exist. Instead, AusPro merely discusses how earlier Texas Supreme Court cases indicated that the language of Article I, Section 8 differs from the First Amendment and that the Texas provision might provide greater protection. AusPro Br. 58-63. Its analysis fails to distinguish *Barber* or articulate any specific reasons why the outcome here should be different under the Texas Constitution.

As to the permitting and licensing regulations (even if AusPro hadn't forfeited this challenge, *see supra* Part II.A), AusPro likewise "fail[s] to show how the text, history, or purpose of the Texas Constitution offers greater protection for this type of speech." *Tex. Entm't Ass'n*, 431 S.W.3d at 801. AusPro submits only the bare assertion that prior restraints are presumed unconstitutional, citing *Davenport v. Garcia,* 834 S.W.2d 4 (Tex. 1992). *See* AusPro Br. 64. But *Davenport* addressed a

judicial gag order constituting a "sweeping injunction" of all public and private discussion of a certain case outside the courtroom. *Davenport*, 834 S.W.2d at 6. That judicial injunction bears scant resemblance to the Act's targeted regulations.

AusPro doesn't even begin to explain why a standard harsher than the First Amendment rule would govern a content-neutral permitting regime that aims at noncommunicative aspects of AusPro's conduct and adequately restrains the administrator's discretion in reviewing applications. Invalidating all licensing regimes that touch on political speech would effect a sea change in free-speech law and would unduly impede government entities from enacting regulations designed to protect the public. AusPro's conclusory assertions about Article I, Section 8 do not justify that result.

## PRAYER

The judgment of the district court should be affirmed.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

/s/ Douglas D. Geyser
DOUGLAS D. GEYSER
Assistant Solicitor General
State Bar No. 24059817

MATTHEW BOHUSLAV
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2540
Fax: (512) 474-2697
*douglas.geyser@texasattorneygeneral.gov*

COUNSEL FOR APPELLEE
TEXAS DEPARTMENT OF TRANSPORTATION

**CERTIFICATE OF SERVICE**

On February 19, 2015, the foregoing brief was served via File &

ServeXpress and e-mail on:

Meredith B. Parenti
PARENTI LAW PLLC
P.O. Box 19152
Houston, Texas 77224
[Tel] (281) 224-5848
[Fax] (281) 605-5677
meredith@parentilaw.com

*Counsel for Appellant AusPro Enterprises, LP*


 /s/  Douglas D. Geyser
Douglas D. Geyser


**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this

brief contains 9,739 words, excluding the portions of the brief exempted

by Rule 9.4(i)(1).


 /s/  Douglas D. Geyser
Douglas D. Geyser

# APPENDIX

nesses by adding off-premise signs to areas that are deficient of off-premise signs. They also request that the department help the outdoor industry maintain existing signs which keep a business healthy.

RESPONSE: The department agrees in part with this comment. The department is charged with regulating the outdoor advertising industry. The department's goal is not to increase or limit the number of billboards but rather to effectively and consistently regulate the billboard program. The department believes that these new rules will enable the department to carry out its statutory responsibilities in a fair and equitable manner.

COMMENT: Property Rights Association commented and requested that the department look at anything that removes the opportunity to have a sign, makes it tougher for sign owners to be in business, or removes a source of income for property owners.

RESPONSE: The department has considered these issues and believes these rules balance the business opportunities for sign companies and property owners against the department responsibility to regulate outdoor advertising issues. The rules do in some situations limit new billboard construction. The department feels that the changes made in this area are necessary to address enforcement and compliance issues. The rules now require the business activity to be open for 180 days prior to the permit application and that the business is open 25 hours per week. The department feels that these changes are necessary to improve enforcement and to prohibit billboard construction in areas that do not qualify under the statute. Transportation Code, §391.031 allows billboards in locations that, although not zoned commercial, the land use is consistent with an area zoned for those purposes. By requiring the business to be in operation 180 days and open 25 hours per week the department is trying to ensure that billboards are only placed in areas that comply with the statutory requirement. In addition, the department has added several features that benefit the property owner in these rules such as the land owner notices.

## SUBCHAPTER I.   REGULATION OF SIGNS ALONG INTERSTATE AND PRIMARY HIGHWAYS

### 43 TAC §§21.141 - 21.163

STATUTORY AUTHORITY

The repeals are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101263
Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683

♦    ♦    ♦

## DIVISION 1.   SIGNS

### 43 TAC §§21.141 - 21.203

STATUTORY AUTHORITY

The new sections are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

*§21.141.   Purpose.*

This division is established to regulate the orderly and effective display of outdoor advertising along a regulated highway within the State of Texas.

*§21.142.   Definitions.*

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

    (1)   Commission--The Texas Transportation Commission.

    (2)   Department--The Texas Department of Transportation.

    (3)   Erect--To construct, build, raise, assemble, place, affix, attach, embed, create, paint, draw, or in any other way bring into being or establish.

    (4)   Freeway--A divided, controlled access highway for through traffic. The term includes a toll road.

    (5)   Highway--The width between the boundary lines of a publicly maintained way any part of which is open to the public for vehicular travel.

    (6)   Interchange--A system of interconnecting roadways in conjunction with one or more grade separations that provides for the

movement of traffic between two or more roadways or highways on different levels.

(7) Intersection--The common area at the junction of two highways that are on the primary system. The common area includes the area within the lateral boundary lines of the roadways.

(8) Interstate highway system--Highways designated officially by the commission and approved pursuant to 23 United States Code §103 as part of the national system of interstate and defense highways.

(9) License--An outdoor advertising license issued by the department.

(10) Main-traveled way--The traveled way of a highway that carries through traffic. In the case of a divided highway, the traveled way of each of the separate roadways for traffic in opposite directions is a main-traveled way. It does not include such facilities as frontage roads, turning roadways, or parking areas.

(11) National Highway System--Highways designated officially by the commission and approved pursuant to 23 United States Code §103 as part of the national highway system.

(12) Nonconforming sign--A sign that was lawfully erected but that no longer complies with a law or rule because of changed conditions or because the law or rule was amended after the sign was erected or that fails to comply with a law enacted or rule adopted after the sign was erected.

(13) Nonprofit sign--A sign that is erected and maintained by a nonprofit organization under a permit issued under §21.149 of this division (relating to Nonprofit Sign Permit).

(14) Person--An individual, association, partnership, limited partnership, trust, corporation, or other legal entity.

(15) Primary system--Highways designated by the commission as the federal-aid primary system and any highway on the National Highway System. The term includes all roads designated as part of the National Highway System as of 1991.

(16) Public park--A public park, forest, playground, nature preserve, or scenic area designated and maintained by a political subdivision or governmental agency.

(17) Regulated highway--A highway on the interstate highway system or primary system.

(18) Rest area--An area of public land designated by the department as a rest area, comfort station, picnic area, or roadside park.

(19) Sign--An object that is designed, intended, or used to advertise or inform, including a sign, display, light, device, figure, painting, drawing, message, plaque, placard, poster, billboard, logo, or symbol.

(20) Sign face--The part of the sign that contains advertising or information and is distinguished from other parts of the sign, including another sign face, by borders or decorative trim. The term does not include a lighting fixture, apron, or catwalk unless it displays a part of the advertising or information contents of the sign.

(21) Sign structure--All of the interrelated parts and materials, such as beams, poles, braces, apron, frame, catwalk, and stringers that are used, designed to be used, or intended to be used to support or display a sign face.

(22) Visible--Capable of being read or identified by a person with normal visual acuity.

§21.143.   Permit Required.

Except as provided by this chapter, unless a person holds a permit issued under §21.164 of this division (relating to Decision on Application) or §21.200 of this division (relating to Local Control), the person may not erect or maintain an outdoor sign that is:

(1) within 660 feet of the nearest edge of the right of way of a regulated highway if any part of the sign's advertising or information content is visible from any place on the main-traveled way of the highway; or

(2) outside of the jurisdiction of an incorporated city and more than 660 feet from the nearest edge of the right of way of a regulated highway if any part of the sign's advertising or information content is visible from the main-traveled way of the highway and the sign was erected for the purpose of having its advertising or information content seen from the main-traveled way of the highway.

§21.144.   License Required.

(a) Except as provided by this division, a person may not obtain a permit for a sign under this division unless the person holds a currently valid license issued under §21.153 of this division (relating to License Issuance) applicable to the county in which the sign is to be erected or maintained.

(b) A license is valid for one year from the date of issuance or most recent renewal.

§21.146.   Exempt Signs.

(a) The following signs are exempt from this division:

(1) an on-premise sign that meets the criteria provided by §21.147 of this division (relating to On-premise Sign) except as provided by subsection (c) of this section;

(2) a sign that has the purpose of protecting life or property;

(3) a sign that provides information about underground utility lines;

(4) an official sign that is erected by a public officer, public agency, or political subdivision under the officer's, agency's, or political subdivision's constitutional or statutory authority;

(5) a sign required by the Railroad Commission of Texas at the principal entrance to or on each oil or gas producing property, well, tank, or measuring facility to identify or to locate the property if the sign is no larger than necessary to comply with the Railroad Commission's regulations;

(6) a sign of a nonprofit service club, charitable association, religious organization, chamber of commerce, nonprofit museum, or governmental entity that gives information about the meetings, services, events, or locations of the entity and that does not exceed an area of 32 square feet;

(7) a public service sign that:

(A) is located on a school bus stop seating bench or shelter;

(B) identifies the donor, sponsor, or contributor of the shelter;

(C) contains a public service message that occupies at least 50 percent of the area of the sign;

(D) has no content other than that described by subparagraphs (B) and (C) of this paragraph;

(E) is authorized or approved by the law of the entity that controls the highway involved, including being located at a place approved by the entity;

(F) has a sign face that does not exceed an area of 32 square feet; and

(G) is not facing the same direction as any other sign on that seating bench or shelter;

(8) a sign that shows only the name of a ranch on which livestock are raised or a farm on which crops are grown and the directions to, telephone number, or internet address of the ranch or farm and that has a sign face that does not exceed an area of 32 square feet;

(9) a sign that:

(A) relates only to a public election;

(B) is located on private property;

(C) is erected after the 91st day before the date of the election and is removed before the 11th day after the election date;

(D) has a sign face that does not exceed an area of 50 square feet; and

(E) contains no commercial endorsement; and

(10) a sign identifying the name of a recorded subdivision located at an entrance to the subdivision or on property owned by or assigned to the subdivision, home owners association, or other entity associated with the subdivision.

(b) This division does not apply to a sign that was erected before October 23, 1965 and that the commission, with the approval of the Secretary of the United States Department of Transportation, has determined to be a landmark sign of such historic or artistic significance that preservation would be consistent with the purposes of the Highway Beautification Act of 1965, 23 United States Code §131.

(c) An on-premise sign cannot be erected earlier than one year before the date that the business for which the sign is erected will open and conduct business.

§21.147. On-premise Sign.

(a) An on-premise sign is a sign that:

(1) is located on the real property of a business and consists only of:

(A) the name, logo, trademark, telephone number, and internet address of that business; or

(B) an identification of that business's principal or accessory products or services offered on the property;

(2) only advertises the sale of the real property on which the sign is located and is removed within 90 days after the date of the closing of the real property transaction; or

(3) only advertises the lease, including a pre-lease, of the real property on which the sign is located and is removed within 90 days after the date of the closing of the lease transaction.

(b) For the purposes of this section, a sign is located on the real property of a business if:

(1) the real property on which the sign is located and the real property on which the activity of the business is conducted are one contiguous tract that is under common ownership; or

(2) the sign is located on the real property of a commercial development and the businesses of the development share the sign structure of that sign.

(c) For the purpose of subsection (b)(1) of this section, real property is not considered to be a part of one contiguous tract if the real property on which the sign is located is:

(1) separated from the real property on which the business activity is located by a road or highway or by another business;

(2) devoted to a separate purpose unrelated to the advertised business activity;

(3) held under an easement or other lesser property interest than the property interest in the land on which the business activity is located; or

(4) a narrow strip or other configuration of land that cannot be put to any reasonable use related to the advertised business activity other than for signing purposes.

(d) A sign is not an on-premise sign if:

(1) the sign consists principally of brand name or trade name advertising and the product or service advertised is only incidental to the principal activity;

(2) the sign advertises activities that are not conducted on the premises; or

(3) the sign provides rental income to the owner of the real property on which it is located, unless the owner of the real property receives the income from an on-premise business for the use of the sign.

(e) For the purposes of this subsection:

(1) the date of the closing of a sales transaction is the date that legal title to a property is conveyed to a purchaser for property under a contract to buy; and

(2) the date of the closing of a lease transaction is the date that the landlord and tenant enter into a binding lease of a property.

§21.148. Exception to License Requirement for Nonprofit Signs.
A nonprofit organization may erect or maintain a nonprofit sign without obtaining an outdoor advertising license, but the organization must obtain a permit under §21.149 of this division (relating to Nonprofit Sign Permit) to erect or maintain such a sign.

§21.149. Nonprofit Sign Permit.

(a) A nonprofit service club, charitable association, religious organization, chamber of commerce, nonprofit museum, or governmental entity may obtain a permit under this section to erect or maintain a nonprofit sign.

(b) To qualify as a nonprofit sign, the sign must:

(1) be in a municipality or the extraterritorial jurisdiction of a municipality;

(2) advertise or promote only:

(A) the municipality;

(B) a political subdivision whose jurisdiction is wholly or partially located in the municipality; or

(C) the entity that will hold the permit, but may only give information about the meetings, services, events, or location of the entity; and

(3) comply with each sign requirement under this division from which it is not specifically exempted.

(c) An application for a permit under this section must be in a form prescribed by the department and must include, in detail, the content of the message to be displayed on the sign.

(d) After a permit is issued, the permit holder must obtain approval from the department to change the message of the sign. The department may issue an order of removal of the sign if the permit holder fails to obtain that approval.

(e)   If a sign ceases to qualify as a nonprofit sign, the permit for the sign is subject to cancellation under §21.176 of this division (relating to Cancellation of Permit).

(f)   If the holder of a permit issued under this section loses its nonprofit status or wishes to change the sign so that it no longer qualifies as a nonprofit sign the permit holder must:

(1)   obtain a license under §21.153 of this division (relating to License Issuance); and

(2)   convert the sign permit to a permit for a sign other than a nonprofit sign and pay the original permit and renewal fees provided by §21.175 of this division (relating to Permit Fees).

### §21.150.   Continuance of Nonconforming Signs.

(a)   Notwithstanding other provisions of this division, the department will renew a permit for a nonconforming sign only if the sign structure:

(1)   was lawful on the later of the date it was erected or became subject to the control of the department; and

(2)   remains substantially the same as it was on the later of the date it was erected, became subject to the department's control, or became a nonconforming sign.

(b)   A sign that was legally erected before March 3, 1986 in a railroad, utility, or road right of way that is not owned by the state or a political subdivision may be maintained as a nonconforming sign if all other requirements of this division are met.

(c)   A nonconforming sign may not be:

(1)   removed and re-erected for any reason, other than a request by a condemning authority; or

(2)   substantially changed, as described by §21.191 of this division (relating to Repair and Maintenance).

(d)   A nonprofit organization that holds a permit for a nonconforming sign that otherwise qualifies for a permit under §21.149 of this division (relating to Nonprofit Sign Permit) may convert the permit to one issued under that section.

### §21.151.   Time Proposed Roadway Becomes Subject to Division.

For the purposes of this division, a proposed roadway becomes a roadway or a proposed interchange becomes an interchange:

(1)   when environmental clearance and the approved alignment have been obtained from the Federal Highway Administration; or

(2)   if environmental clearance and approved alignment from the Federal Highway Administration are not required for a proposed roadway, when the alignment is approved by the department or other political subdivision responsible for constructing the roadway.

### §21.152.   License Application.

(a)   To apply for a license under this division, a person must file an application in a form prescribed by the department. The application must include at a minimum:

(1)   the complete legal name, mailing address, and telephone number of the applicant; and

(2)   designation of each county in which the applicant's signs are to be erected or maintained.

(b)   The application must be signed, notarized, and filed with the department and be accompanied by:

(1)   a fully executed outdoor advertiser's surety bond:

(A)   in the amount of $2,500 for each county designated under subsection (a)(2) of this section up to a maximum of $10,000;

(B)   payable to the commission to reimburse the department for removal costs of a sign that the license holder unlawfully erects or maintains; and

(C)   in a form prescribed by the department, executed by a surety company authorized to transact business in this state;

(2)   a duly certified power of attorney from the surety company authorizing the surety company's representative to execute the bond on the effective date of the bond; and

(3)   the license fee prescribed by §21.156 of this division (relating to License Fees).

### §21.153.   License Issuance.

(a)   The department will issue a license if the requirements of §21.152 of this division (relating to License Application) are satisfied.

(b)   The department will not issue a license to an entity that is not authorized to conduct business in this state.

### §21.154.   License Not Transferable.

A license issued under this division is not transferable.

### §21.155.   License Renewals.

(a)   To continue a license in effect, the license must be renewed.

(b)   To renew a license, the license holder must file a written application in a form prescribed by the department accompanied by each applicable license fee prescribed by §21.156 of this division (relating to License Fees). The application must be received by the department before the 46th day after the date of the license's expiration and must include at a minimum:

(1)   the complete legal name, mailing address, and telephone number of the license holder;

(2)   number of the license being renewed;

(3)   proof of current surety bond coverage; and

(4)   the signature of the license holder or person signing on behalf of the business entity.

(c)   A license is not eligible for renewal if the license holder is not authorized to conduct business in this state.

### §21.156.   License Fees.

(a)   The amount of the fee for the issuance of a license issued under this subchapter is $125.

(b)   The amount of the annual renewal fee is $75.

(c)   In addition to the $75 annual renewal fee, an additional late fee of $100 is required for a renewal license application that is received before the 45th day after the expiration date of the license.

(d)   A license fee is payable by check, cashier's check, or money order made payable to the Texas Highway Beautification Fund, and must be submitted with the application. If the check or money order is dishonored upon presentment, the license is voidable.

(e)   The department will provide a renewal notification to the license holder at least 45 days before the date of the license expiration and if the license is not renewed before it expires, the department within 20 days after the date of expiration will provide notification to the license holder of the opportunity to file a late renewal application.

### §21.157.   Temporary Suspension of License.

If the department is notified by a surety company that a bond is being canceled, the department will notify the license holder by certified mail that a new bond must be obtained and filed with the department before the bond cancellation date or the 30th day after the day of the receipt of the notice, whichever is later.

§21.158.   License Revocation.

(a)   The department will revoke a license and will not issue or renew permits or transfer existing permits under the license if:

(1)   the surety bond is not provided within the time specified by the department under §21.152 of this division (relating to License Application) or §21.155 of this division (relating to License Renewals);

(2)   surety bond coverage is terminated under §21.157 of this division (relating to Temporary Suspension of License);

(3)   the number of final enforcement actions of this subchapter, or Transportation Code, Chapter 391, committed by the license holder in the aggregate equal or exceed:

(A)   10 percent of the number of valid permits held by the license holder if the license holder holds more than 1,000 sign permits;

(B)   20 percent of the number of valid permits held by the license holder if the license holder holds at least 500 but fewer than 1,000 sign permits;

(C)   25 percent of the number of valid permits held by the license holder if the license holder holds at least 100 but fewer than 500 sign permits; or

(D)   30 percent of the number of valid permits held by the license holder if the license holder holds fewer than 100 sign permits; or

(4)   the license holder has not complied with previous final administrative enforcement actions regarding the license or any permit held under the license.

(b)   The department will send notice by certified mail of an action under this section to the address of record provided by the license holder.

(c)   The notice will clearly state:

(1)   the reasons for the action;

(2)   the effective date of the action;

(3)   the right of the license holder to request an administrative hearing; and

(4)   the procedure for requesting a hearing including the period in which the request must be made.

(d)   A request for an administrative hearing under this section must be made in writing to the department within 45 days after the date that the notice is mailed.

(e)   If timely requested, an administrative hearing will be conducted in accordance with Chapter 1, Subchapter E of this title (relating to Procedures in Contested Case).

§21.159.   Permit Application.

(a)   To obtain a permit for a sign, a person must file an application in a form prescribed by the department. The application must include, at a minimum:

(1)   the complete name and address of the applicant;

(2)   the original signature of the applicant;

(3)   the proposed location and description of the sign;

(4)   the complete legal name and address of the owner of the designated site;

(5)   a statement of whether the requested sign is located within an incorporated city or within the city's extraterritorial jurisdiction;

(6)   the site owner's or the owner's authorized representative's original signature on the application demonstrating:

(A)   consent to the erection and maintenance of the sign; and

(B)   right of entry onto the property of the sign location by the department or its agents;

(7)   a document from the city that provides the city's current zoning map or the portion of that map applicable to the sign's location; and

(8)   information that details how and the location from which the sign will be erected and maintained.

(b)   If the sign is a nonprofit sign, the application must include verification of the applicant's nonprofit status.

(c)   If the sign is to be located within the jurisdiction of a municipality, including the extraterritorial jurisdiction of the municipality, that is exercising its authority to regulate outdoor advertising, a certified copy of the permit issued by the municipality must be submitted with the application unless documentation is provided to show that the municipality requires:

(1)   the issuance of a department permit before the municipality's; or

(2)   the erection of the sign within a period of less than twelve months after the date of the issuance of the municipal permit.

(d)   The application must be:

(1)   notarized;

(2)   filed with the department's division responsible for the outdoor advertising program in Austin; and

(3)   accompanied by the fee prescribed by §21.175 of this division (relating to Permit Fees).

(e)   The application must include a sketch that shows:

(1)   the location of the poles of the sign structure;

(2)   the exact location of the sign faces in relation to the sign structure;

(3)   the means of access to the sign; and

(4)   the distance from the buildings, landmarks, right of way line, other signs, and other distinguishable features of the landscape.

§21.161.   Site Owner's Consent; Withdrawal.

(a)   A site owner's consent to the erection and maintenance of the sign and access to the site by the department or its agent is provided with a permit application under §21.159 of this division (relating to Permit Application). The consent operates for the life of the lease or until the owner delivers to the department and to the sign owner a written statement that permission for the maintenance or inspection by the department or its agents of the sign has been withdrawn and documentation showing that the lease allowing the sign has been terminated in accordance with the terms of the lease agreement or through a court order.

(b)   If the sign owner provides documentation that the sign owner is disputing the lease termination, the department will not

cancel the permit until a settlement signed by both parties or a court order settling the dispute is delivered to the department.

§21.163. *Permit Application Review.*

(a) The department will consider permit applications in the order of the receipt of the applications.

(b) If an application is returned to an applicant because it is not complete or has incorrect information, the application loses its priority position.

(c) The department will hold an application that is for the same site as or a conflicting site with that of an application that the department previously received until the department makes a final decision on the previously received application or returns it to the applicant. The department will notify the applicant that the applicant's application is being held because an application for the same or a conflicting site was previously received. For the purposes of this subsection, the date of a final decision on an application is:

(1) the date of the final decision on an appeal under §21.170 of this division (relating to Appeal Process for Permit Denials); or

(2) if an appeal is not filed within the period provided by §21.170 of this division, on the 46th day after the date the denial notice was received under §21.164 of this division (relating to Decision on Application).

(d) The department will review the permit application for completeness and compliance with all requirements of this division. Measurements will be taken at the site to determine if the sign placement meets the spacing and location requirements.

§21.164. *Decision on Application.*

(a) The department will make a decision on an application within 45 days after the date of receipt of the application. If the decision cannot be made within the 45 day period the department will notify the applicant of the delay and provide the reason for the delay and provide an estimate for when the decision will be made.

(b) If the permit application is approved, the department will issue a permit for the sign by sending a copy of the approved application and a sign permit plate to the applicant.

(c) If the permit application is not approved, the department will send a copy of the denied application and a notice that states the reason for the denial.

(d) If an application is denied, the department will notify the landowner identified on the permit application of the denial. The notice is for informational purposes only, and does not convey any rights to the landowner. The landowner may not appeal the denial unless the landowner is also the applicant.

§21.165. *Sign Permit Plate.*

(a) The sign owner shall securely attach the sign permit plate to the part of the sign structure that is nearest to and visible from the closest right of way not later than the 30th day after the date that:

(1) the sign is erected; or

(2) the permit is issued if the sign is lawfully in existence when the highway along which it is located becomes subject to this division.

(b) The sign permit plate may not be removed from the sign.

(c) The sign permit plate must remain visible from the closest right of way at all times.

(d) If a sign permit plate is lost or stolen or becomes illegible, the sign owner must submit to the department a request for a replacement plate on a form prescribed by the department accompanied by the replacement plate fee prescribed by §21.175 of this division (relating to Permit Fees).

(e) Failure to apply for a replacement permit plate or attach the plate to the sign structure as required in subsection (a) of this section within 60 days after the date of receipt of written notification from the department that the permit plate is not attached or not visible may result in the cancellation of the permit under §21.176 of this division (relating to Cancellation of Permit).

§21.166. *Sign Location Requirements.*

(a) The department will not issue a permit under this division unless the sign for which application is made is located along a roadway to which Transportation Code, Chapter 391, applies and is in:

(1) an unzoned commercial or industrial area; or

(2) a zoned commercial or industrial area.

(b) Subsection (a) of this section does not apply to a sign that was lawfully in existence when it became subject to Transportation Code, Chapter 391.

§21.168. *Conversion of Certain Authorization to Permit.*

(a) The department will convert a registration issued under §21.409 of this chapter (relating to Permit Application) or a permit issued under §21.407 of this chapter (relating to Existing Off-Premise Signs) to a permit under this division if a highway previously regulated under Transportation Code, Chapter 394 becomes subject to Transportation Code, Chapter 391.

(b) A holder of a permit or registration converted under this section is not required to pay an original permit fee under §21.175 of this division (relating to Permit Fees). The permit must be renewed under §21.172 of this division (relating to Permit Renewals), on the date the renewal of the permit or registration issued under §21.407 or §21.409 of this chapter, as appropriate, would have been due.

(c) If a sign owner has prepaid registration fees under §21.407 of this chapter, the outstanding balance will be credited to the sign owner's annual renewal fee.

(d) The department will issue a sign permit plate to a holder of a permit or a registration converted under this section at no charge. If a replacement plate is needed after the initial issuance, a fee will be charged in accordance with §21.175 of this division.

§21.169. *Notice of Sign Becoming Subject to Regulation.*

(a) The department will send notice by certified mail to the owner of a sign that becomes subject to Transportation Code, Chapter 391 because of the construction of a new highway, the change in designation of an existing highway, or decertification of a certified city. If the owner of the sign cannot be identified from the information on file with the department, the department will give notice by prominently posting the notice on the sign for a period of 45 consecutive days.

(b) If the owner of a sign described by subsection (a) of this section does not hold a license issued under §21.153 of this division (relating to License Issuance), the owner must obtain the license within 60 days after the day that:

(1) the department sends notice under subsection (a) of this section; or

(2) the 45-day posting period under subsection (a) of this section ends.

§21.170. *Appeal Process for Permit Denials.*

(a) If a sign permit is denied, the applicant may file a request with the executive director for an appeal.

(b)    The request for appeal must:

   (1)    be in writing;

   (2)    contain:

      (A)    a copy of the denied permit application;

      (B)    a statement of why the denial is believed to be in error; and

      (C)    evidence that supports the issuance of the application, such as drawings, surveys, or photographs; and

   (3)    be received within 45 days after the date the denial notice was received.

(c)    The executive director or the executive director's designee who is not below the level of assistant executive director, will make a final determination on the appeal within 60 days after the date that the executive director receives the request for appeal. If the final determination is that the permit is denied, the executive director or the executive director's designee will send the final determination to the applicant stating the reason for denial. If the determination is that the application be approved, the department will issue the permit in accordance with §21.164 of this division (relating to Decision on Application).

(d)    If the executive director or designee is unable to make a final determination on the appeal within the 60-day period under subsection (c) of this section, the department will notify the applicant by mail of the delay and provide an estimated time in which a final determination will be made.

§21.171.    Permit Expiration.
(a)    A permit is valid for one year.

(b)    A permit automatically expires on the date that the license under which the permit was issued expires or is revoked by the department under §21.158 of this division (relating to License Revocation).

§21.172.    Permit Renewals.
(a)    To be continued in effect, a sign permit must be renewed.

(b)    A permit is eligible for renewal if the sign for which it was issued continues to meet all applicable requirements of this division and Transportation Code, Chapter 391.

(c)    To renew the permit, the permit holder must file with the department a written application in a form prescribed by the department accompanied by the applicable fees prescribed by §21.175 of this division (relating to Permit Fees). The application must be received by the department before the 46th day after the date of the permit's expiration.

(d)    A permit may not be renewed if the sign for which it was issued is not erected to the extent that it includes a sign face before the first anniversary of the date that the permit was issued.

(e)    The department will provide a renewal notification to the license holder at least 30 days before the date of the permit expiration and if the permit is not renewed before it expires the department within 20 days after the date of expiration will provide notification to the license holder of the opportunity to file a late renewal.

§21.173.    Transfer of Permit.
(a)    A sign permit may be transferred only with the written approval of the department.

(b)    At the time of the transfer, both the transferor and the transferee must hold a valid license issued under §21.153 of this division (relating to License Issuance), except as provided in subsections (e) - (g) of this section.

(c)    To transfer one or more sign permits, the permit holder must send to the department a written request in a form prescribed by the department accompanied by the prescribed transfer fee.

(d)    If the request is approved, the department will send to the transferor and to the transferee a copy of the approved permit transfer form.

(e)    A permit issued to a nonprofit organization under §21.149 of this division (relating to Nonprofit Sign Permit) may be transferred to another nonprofit organization that does not hold a license issued under §21.153 of this division if the sign will be maintained as a nonprofit sign.

(f)    A permit issued to a nonprofit organization under §21.149 of this division may be converted to a regular permit and transferred to a person that is not a nonprofit organization if the transferee holds a license for the county in which the sign is located at the time of the transfer and the sign meets all requirements of this division.

(g)    The department may approve the transfer of one or more sign permits from a transferor whose license has expired to a person who holds a license, with or without the signature of the transferor, if the person provides to the department:

   (1)    legal documents showing the sign has been sold; and

   (2)    documents that indicate that the transferor is dead or cannot be located.

(h)    The department will not approve the transfer of a permit if cancellation of the permit is pending or has been abated awaiting the outcome of an administrative hearing.

§21.174.    Amended Permit.
(a)    To perform customary maintenance or to make substantial changes to the sign or sign structure under §21.191 of this division (relating to Repair and Maintenance) a permit holder must submit an amended permit application. To change the sign face of an existing permitted sign to an electronic sign under Division 2 of this subchapter (relating to Electronic Signs) a permit holder must submit an amended permit application.

(b)    The amended permit application must be submitted on a form prescribed by the department and must provide the information required under §21.159 of this division (relating to Permit Application) applicable to an amended permit and indicates the change from the information in the original application for the sign permit. The amended application is not required to contain the signatures of the land owner or city representative.

(c)    The new sign face size, configuration, or location must meet all applicable requirements of this division and if the amended permit is to erect an electronic sign, the requirements of Division 2 of this subchapter.

(d)    The holder of a permit for a nonconforming sign may apply for an amended permit to perform eligible customary maintenance under §21.191(b) of this division. An amended permit will not be issued for a substantial change as described by §21.191(c) of this division to a nonconforming sign.

(e)    Making a change to a sign that requires an amended permit without first obtaining an amended permit is a violation of this division, except as provided by subsection (g) of this section and will result in an administrative enforcement action.

(f)    The department will make a decision on an amended permit application within 45 days of the date of the receipt of the amended permit application. If the decision cannot be made within the 45 day period the department will notify the applicant of the delay, provide the

reason for the delay and provide an estimate of when the decision will be made.

(g) If maintenance or changes authorized under this section are being made on a conforming sign because of a natural disaster, the department may waive the requirement that the required amended permit be issued before the work begins. If the department grants a waiver under this subsection, the permit holder shall submit the amended permit application within 60 days after the date that the work is completed. If the maintenance or changes violate this section or the permit holder fails to submit the amended permit application as required by this subsection, the sign is subject to enforcement and removal actions.

### §21.175. Permit Fees.

(a) The amounts of the fees related to permits under this subchapter are:

(1) $100 for an original or amended permit for a sign;

(2) $100 for an original or amended permit issued under Division 2 of this subchapter for an electronic sign;

(3) $100 for an original permit for a sign that was lawfully in existence when the sign became subject to Transportation Code, Chapter 391;

(4) $75 for the renewal of a permit;

(5) $75 for the renewal of a permit issued under Division 2 of this subchapter for an electronic sign;

(6) $25 for the transfer of a permit up to a maximum of $2,500 for a single transaction regardless of the location of the sign; and

(7) $25 for a replacement sign permit plate.

(b) The original and renewal permit fee for a nonprofit sign permit is $10.

(c) In addition to the $75 annual renewal fee, an additional late fee of $100 is required for a renewal of a permit that is received before the 46th day after the permit expiration date.

(d) No fee is charged for the transfer of a permit issued to a nonprofit organization to another nonprofit under §21.173 of this division (relating to Transfer of Permit). The fee provided under subsection (a)(6) of this section applies to the conversion and transfer of a permit issued to a nonprofit organization to a person other than a nonprofit organization under §21.173 of this division.

(e) A fee prescribed by this section is payable by check, cashier's check, or money order. If a check or money order is dishonored upon presentment, the permit, renewal, or transfer is void.

### §21.176. Cancellation of Permit.

(a) The department will cancel a permit for a sign if the sign:

(1) is removed, unless the sign is removed and re-erected at the request of a condemning authority;

(2) is not maintained in accordance with this division or Transportation Code, Chapter 391;

(3) is damaged beyond repair, as determined under §21.197 of this division (relating to Discontinuance of Sign Due to Destruction);

(4) is abandoned, as determined under §21.181 of this division (relating to Abandonment of Sign);

(5) is erected after the effective date of this section and is not built within twenty feet of the location described in the permit application or is built within twenty feet of the location described in the permit application but at a location that does not meet all spacing requirements of this chapter or in accordance with the sketch or other assertions contained in the permit application;

(6) is repaired or altered without obtaining a required amended permit under §21.174 of this division (relating to Amended Permit);

(7) is built by an applicant who uses false information on a material issue of the permit application;

(8) is erected, repaired, or maintained in violation of §21.199 of this division (relating to Destruction of Vegetation and Access from Right of Way Prohibited);

(9) has been made more visible by the permit holder clearing vegetation from the highway right of way in violation of §21.199 of this division;

(10) is located in an unzoned commercial or industrial area and the department has evidence that an activity supporting the unzoned commercial or industrial area was created primarily or exclusively to qualify the area as an unzoned commercial or industrial area, and that no business has been conducted at the activity site within one year; or

(11) does not have the permit plate properly attached under §21.165 of this division (relating to Sign Permit Plate).

(b) Before initiating an enforcement action under this section, the department will notify the sign owner in writing of the violation of subsection (a)(5) or (11) of this section and will give the sign owner 60 days to correct the violation and provide proof of the correction the department.

(c) Upon determination that a permit should be canceled, the department will mail a notice of cancellation to the address of the record license holder. The notice must state:

(1) the reason for the cancellation;

(2) the effective date of the cancellation;

(3) the right of the permit holder to request an administrative hearing on the cancellation; and

(4) the procedure for requesting a hearing and the period for filing the request.

(d) A request for an administrative hearing under this section must be in writing and delivered to the department within 45 days after the date that the notice of cancellation is received.

(e) If timely requested, an administrative hearing will be conducted in accordance with Chapter 1, Subchapter E of this title (relating to Procedures in Contested Case) and the cancellation is abated until the cancellation is affirmed by order of the commission.

(f) A permit holder may voluntarily cancel a permit by submitting a request in writing after the sign has been removed. Subsections (c) - (e) of this section do not apply to a permit voluntarily canceled under this subsection.

(g) The department will notify the landowner identified on the permit application of a cancellation enforcement action. The notice is for informational purposes only, and does not convey any rights to the landowner. The landowner may not appeal the cancellation unless the landowner is also the holder of the permit.

### §21.177. Commercial or Industrial Area.

For the purposes of this division, a commercial or industrial area is:

(1) a zoned commercial or industrial area described by §21.178 of this division (relating to Zoned Commercial or Industrial Area); or

(2) an unzoned commercial or industrial area described by §21.179 of this division (relating to Unzoned Commercial or Industrial Area).

*§21.179. Unzoned Commercial or Industrial Area.*

(a) An unzoned commercial or industrial area is an area that:

(1) is within 800 feet, measured along the edge of the highway right of way perpendicular to the centerline of the main-traveled way, of and on the same side of the highway as the principal part of at least two adjacent recognized commercial or industrial activities that meet the requirements of subsection (c) of this section;

(2) is not predominantly used for residential purposes; and

(3) has not been zoned under authority of law.

(b) A part of the regularly used buildings, parking lots, or storage or processing areas of each of the commercial or industrial activities must be within 200 feet of the highway right of way and portion of the permanent building in which the activity is conducted must be visible from the main-traveled way.

(c) For commercial or industrial activities to be considered adjacent for the purposes of subsection (a)(1) of this section, the regularly used buildings, parking lots, storage or processing areas of the activities may not be separated by a vacant lot, an undeveloped area that is more than 50 feet wide, a road, or a street.

(d) Two activities that occupy the same building qualify as adjacent activities for the purposes of subsection (a)(1) of this section, if:

(1) each activity:

(A) has at least 400 square feet of floor space dedicated to that activity; and

(B) is an activity that is customarily allowed only in a zoned commercial or industrial area;

(2) the two activities are separated by a dividing wall constructed from floor to ceiling;

(3) the two activities have access to the restroom facilities during all hours the activity is staffed or opened; and

(4) the two activities operate independently of one another.

(e) For the purposes of subsection (d) of this section, two separate product lines offered by one business are not considered to be two activities.

(f) To determine whether an area is not predominantly used for residential purposes under subsection (a)(2) of this section, not more than 50 percent of the area, considered as a whole, may be used for residential purposes. A road or street is considered to be used for residential purposes only if residential property is located on both of its sides. The area to be considered is the total of actual or projected frontage of the commercial or industrial activities plus 800 feet on each side of that frontage, measured along the highway right of way to a depth of 660 feet. The depth of an unzoned commercial or industrial area is measured from the nearest edge of the highway right of way perpendicular to the centerline of the main-traveled way of the highway.

(g) The length of an unzoned commercial or industrial area is measured from the outer edge of the regularly used building, parking lot, storage, or processing area of the commercial or industrial activity and along or parallel to the edge of the pavement of the highway. If the business activity does not front the highway, a projected frontage is measured from the outer edge of the regularly used building, parking lot, storage, or processing area to a point perpendicular to the centerline of the main-traveled way.

(h) A sign is not required to meet the requirements of subsection (d)(1)(A), (2), or (3) of this section or §21.180 of this division (relating to Commercial or Industrial Activity) to maintain conforming status if the permit for the sign was issued before the effective date of this section.

*§21.180. Commercial or Industrial Activity.*

(a) For the purposes of this division, a commercial or industrial activity is an activity that:

(1) is customarily allowed only in a zoned commercial or industrial area; and

(2) is conducted in a permanent building or structure permanently affixed to the real property that:

(A) has an indoor restroom, running water, functioning electrical connections, and permanent flooring, other than dirt, gravel, or sand;

(B) is visible from the traffic lanes of the main-traveled way;

(C) is not primarily used as a residence; and

(D) has at least 400 square feet of its interior floor space devoted to the activity.

(b) The following are not commercial or industrial activities:

(1) agricultural, forestry, ranching, grazing, farming, and related activities, including the operation of a temporary wayside fresh produce stand;

(2) an activity that is conducted only seasonally;

(3) an activity that has not been conducted at its present location for at least 180 days;

(4) an activity that is not conducted by at least one person who works for the business at the activity site for at least 25 hours per week on at least five days per week and for which the hours during which the activity is conducted are posted at the activity site;

(5) the operation or maintenance of:

(A) an outdoor advertising structure;

(B) a recreational facility, such as a campground, golf course, tennis court, wild animal park, or zoo, other than the related activities conducted in a building or structure that meets the requirements of subsection (a)(2) of this section and the parking facilities for that building or structure;

(C) an apartment house or residential condominium;

(D) a public or private preschool, secondary school, college, or university, other than a trade school or corporate training campus;

(E) a quarry or borrow pit, other than the related activities conducted in a building or structure that meets the requirements of subsection (a)(2) of this section and the parking facilities for that building or structure;

(F) a cemetery; or

(G) a place that is primarily used for worship;

(6) an activity that is conducted on a railroad right of way; and

(7)  an activity that is created primarily or exclusively to qualify an area as an unzoned commercial or industrial area.

(c)  For the purposes of this section, a building is not primarily used as a residence if more than 50 percent of the building's square footage is used solely for the business activity.

(d)  A sign is not required to meet the requirements of subsections (a)(2)(C) (as clarified by subsection (c) of this section), (a)(2)(D), (b)(3), or (b)(4) of this section to maintain conforming status if the permit for the sign was issued before the effective date of this section.

*§21.181.  Abandonment of Sign.*

(a)  The department may consider a sign abandoned and cancel the sign's permit if:

(1)  the sign face is blank or without legible advertising or copy for a period of 365 consecutive days or longer; or

(2)  the sign needs to be repaired or is overgrown by trees or other vegetation.

(b)  Small temporary signs, such as garage sale signs or campaign signs, that are attached to the structure do not constitute legible advertising or copy for the purpose of ending the period under subsection (a)(1) of this section.

(c)  The department will not consider the payment of property taxes or the retention of a sign as a balance sheet asset in determining whether the sign permit should be canceled under this section.

(d)  The department may initiate the cancellation process if the department has evidence that supports the fact that the sign face has been blank or has been without legible advertisement or copy for 365 days, such as photographs showing that on at least four dates throughout the 365-day period the sign was in the same condition or was degrading. Evidence is not required for each of the 365 days.

(e)  If the location of the abandoned sign is allowed under this division, the department may issue a permit for the sign site to anyone who submits an application that meets the requirements of this division. The department will not issue a permit for an abandoned sign that is located in a place that does not meet the requirements of this division.

(f)  For the purposes of this section "copy" includes any advertisement that the sign is available for lease.

(g)  A multi-face sign is not abandoned unless all sign faces may be considered abandoned under this section.

(h)  Before initiating a cancellation process under this section the department will provide notice to the sign owner and land owner as identified on the permit application of the abandonment determination and allow the sign owner 60 days to correct the issue.

*§21.182.  Sign Face Size and Positioning.*

(a)  A sign face may not exceed:

(1)  672 square feet in area;

(2)  25 feet in height; and

(3)  60 feet in length.

(b)  For the purposes of this section, border and trim are included as part of the sign face.

(c)  Notwithstanding the area limitation provided by subsection (a)(1) of this section, one or more temporary protrusions may be added to a sign, provided that:

(1)  the sign face, including the protrusions, meets the height and length limitations of subsection (a) of this section;

(2)  the area of the protrusion does not exceed 35 percent of the area indicated on the sign permit; and

(3)  the sign face, including the area of the protrusions, does not exceed 907 square feet in area.

(d)  The area is measured by the smallest square, rectangle, triangle, circle, or combination that encompasses the entire sign face.

(e)  A sign may have two or more sign faces that are placed back-to-back, side-by-side, stacked, or in "V" type construction with not more than two faces presented in each direction. If such an arrangement is used, the sign structure or structures are considered to be one sign for all purposes. Two sign faces which together exceed 907 square feet in area, including temporary protrusions, may not face in the same direction.

(f)  Two sign faces that face in the same direction may be presented as one face by covering both faces and the area between the faces with an advertisement, as long as the size limitations of subsection (a) of this section are not exceeded.

*§21.189.  Sign Height Restrictions.*

(a)  Except as provided by subsection (f) of this section, a sign may not be erected that exceeds an overall height of 42-1/2 feet.

(b)  A roof sign that has a solid sign face surface may not at any point exceed 24 feet above the roof level.

(c)  A roof sign that has an open sign face in which the uniform open area between individual letter or shapes is not less than 40 percent of the total gross area of the sign face may not at any point exceed 40 feet above the roof level.

(d)  The lowest point of a projecting roof sign or a wall sign must be at least 14 feet above grade.

(e)  For the purposes of this section, height is measured from the grade level of the centerline of the main-traveled way closest to the sign, at a point perpendicular to the sign location. A frontage road of a controlled access highway or freeway is not considered the main-traveled way for purposes of this subsection.

(f)  The height measurement does not include any renewable energy device such as solar panels or wind turbines that are attached to the sign structure above the sign face to improve the energy efficiency of the sign structure.

*§21.190.  Lighting of and Movement on Signs.*

(a)  A sign may not contain or be illuminated by flashing, intermittent, or moving lights, including any type of screen using animated or scrolling displays, except that this subsection does not apply to a sign that only provides public service information, such as time, date, temperature, weather, or similar information.

(b)  Except for a relocated sign, any new sign may be illuminated but only by:

(1)  upward lighting of no more than 4 luminaires per direction of the sign face or faces of the structure; or

(2)  downward lighting of no more than 4 luminaires per direction of the sign face or faces of the structure.

(c)  Lights that are a part of or illuminate a sign:

(1)  must be shielded, directed, and positioned to prevent beams or rays of light from being directed at any portion of the traveled ways of a regulated highway;

(2)  may not be of such intensity or brilliance as to cause vision impairment of a driver of any motor vehicle on a regulated high-

way or otherwise interfere with the driver's operation of a motor vehicle; and

(3) may not obscure or interfere with the effectiveness of an official traffic sign, device, or signal.

(d) A temporary protrusion on a sign may be animated only if it does not create a safety hazard to the traveling public. A temporary protrusion may not be illuminated by flashing or moving lights or enhanced by reflective material that creates the illusion of flashing or moving lights.

(e) Reflective paint or reflective disks may be used on a sign face only if the paint or disks do not:

(1) create the illusion of flashing or moving lights; or

(2) cause an undue distraction to the traveling public.

(f) A neon light may be used on a sign face only if:

(1) the light does not flash;

(2) the light does not cause an undue distraction to the traveling public; and

(3) the permit for the sign specifies that the sign is an illuminated sign.

(g) This division does not prohibit a temporary protrusion that displays only alphabetical or numerical characters and that satisfies this subsection and the requirements of §21.182 of this division (relating to Sign Face Size and Positioning), relating to a temporary protrusion. The display on the temporary protrusion may be a digital or other electronic display, but if so:

(1) it must consist of a stationary image;

(2) it may not change more frequently than four times in any 24 hour period; and

(3) the process of any change of display must be completed within two minute.

§21.191. *Repair and Maintenance.*

(a) The following are considered to be routine maintenance activities that do not require an amended permit:

(1) the replacement of nuts and bolts;

(2) nailing, riveting, or welding;

(3) cleaning and painting;

(4) manipulation of the sign structure to level or plumb it;

(5) changing of the advertising message;

(6) the replacement of minor parts if the materials of the minor parts are the same type as those being replaced and the basic design or structure of the sign is not altered;

(7) changing all or part of the sign face structure but only if materials similar to those of the sign face being replaced are used; and

(8) upgrading existing lighting for an energy efficient lighting system.

(b) The following are considered to be customary maintenance activities that may be made but require an amended permit before the initiation of such an activity:

(1) replacement of poles, but only if not more than one-half of the total number of poles of the sign structure are replaced in any 12 month period and the same material is used for the replacement poles; and

(2) adding a catwalk to the sign structure.

(c) The following are examples of substantial changes that may be made but require an amended permit application before the initiation of such an activity:

(1) adding lights to an unilluminated sign or adding more intense lighting to an illuminated sign whether or not the lights are attached to the sign structure;

(2) changing the number of poles in the sign structure;

(3) adding permanent bracing wires, guy wires, or other reinforcing devices;

(4) changing the material used in the construction of the sign structure, such as replacing wooden material with metal material;

(5) adding faces to a sign or changing the sign configuration;

(6) increasing the height of the sign;

(7) changing the configuration of the sign structure, such as changing a "V" sign to a stacked or back to back sign, or a single face sign to a back-to back sign; and

(8) moving the sign structure or sign face in any way unless the movement is made in accordance with §21.192 of this division (relating to Permit for Relocation of Sign).

(d) To add a catwalk to a sign structure the catwalk must meet Occupational Safety and Health Administration guidelines.

§21.192. *Permit for Relocation of Sign.*

(a) A sign may be relocated in accordance with this section, §21.193 of this division (relating to Location of Relocated Sign), §21.194 of this division (relating to Construction and Appearance of Relocated Sign), and §21.195 of this division (relating to Relocation of Sign within Municipality) if the sign is legally erected and maintained and will be within the highway right of way as a result of a highway construction project.

(b) To relocate a sign under this section, the permit holder must obtain a new permit under §21.164 of this division (relating to Decision on Application), but the permit fee is waived.

(c) To receive a new permit to relocate a sign under this section, the permit holder must submit a new permit application that identifies that the application is for the relocation of an existing sign due to a highway construction project. The new location must meet all local codes, ordinances, and applicable laws.

(d) Notwithstanding other provisions of this section, if only a part of a sign will be located within the highway right of way as a result of the construction project, the sign owner may apply to amend the existing permit for the sign to authorize:

(1) the adjustment of the sign face on a monopole sign that would overhang the proposed right of way to the land on which the sign's pole is located, including adding a second pole if required to support the adjustment for a legal non-conforming monopole sign;

(2) the relocation of the poles and sign face of a multiple sign structure that are located in the proposed right of way from the proposed right of way to the land on which the other poles of the sign structure are located; or

(3) a reduction in the size of a sign structure that is located partially in the proposed right of way so that the sign structure and sign face are removed from the proposed right of way.

(e)   A permit application for the relocation of a sign must be submitted within 36 months after the earlier of the date the original sign was removed or the date the original sign was required to move. The sign owner is required to continue to renew the sign permit and pay the permit renewal fee for the sign to remain eligible for relocation.

§21.193.   *Location of Relocated Sign.*

(a)   To receive a new permit for relocation, an existing sign must be relocated on a part of the same parcel of land on which the sign was situated before relocation in a location that is allowed under this section.

(b)   If the sign owner can demonstrate that the location under subsection (a) of this section is not physically or economically feasible for a sign structure, the sign owner, on approval by the department, may relocate the sign to any other location that is allowed under this subsection. The owner is not entitled to additional relocation benefits under §21.196 of this division (relating to Relocation Benefits) if the sign structure is relocated further than 50 miles from the location of the existing sign.

(c)   The location of the relocated sign must be within a zoned commercial or industrial area as described by §21.178 of this division (relating to Zoned Commercial or Industrial Area) or an unzoned commercial or industrial area, as described by §21.179 of this division (relating to Unzoned Commercial or Industrial Area) except that an unzoned commercial or industrial area may include only one recognized commercial or industrial activity.

(d)   A sign may not be relocated to a place where it:

(1)   can cause a driver to be unduly distracted in any way;

(2)   will obscure or otherwise interfere with the effectiveness of an official traffic sign, signal, or device; or

(3)   will obstruct or interfere with the driver's view of approaching, merging, or intersecting motor vehicle or rail traffic.

(e)   A sign may not be relocated to a place that is:

(1)   within 500 feet of a public park that is adjacent to a regulated highway, with the limitation provided under this paragraph applying:

(A)   on either side of a regulated highway that is on a nonfreeway primary system; or

(B)   on the side of the highway adjacent to the public park if the regulated highway is on an interstate or freeway primary system;

(2)   if outside of an incorporated municipality along a regulated highway, adjacent to or within 500 feet of:

(A)   an interchange, intersection at grade, or rest area; or

(B)   a ramp or the ramp's acceleration or deceleration lane;

(3)   for a highway on the interstate or freeway primary system, closer than 500 feet to another permitted sign on the same side of the highway;

(4)   for a highway on the nonfreeway primary system and outside of a municipality, closer than 300 feet to another permitted sign on the same side of the highway;

(5)   for a highway on the nonfreeway primary system and within the incorporated boundaries of a municipality, closer than 100 feet to another permitted sign on the same side of the highway; or

(6)   within five feet of any highway right of way line.

(f)   A sign, at the time of and after its relocation, must be within 800 feet of at least one recognized commercial or industrial activity about which the sign provides information and that is located on the same side of the highway.

(g)   The spacing limitations provided in subsection (e) of this section do not apply to on-premise signs or directional or official signs that are exempted from the application of Transportation Code, §391.031.

(h)   A sign may not be relocated from a road regulated under this division to a rural road regulated by Subchapter K of this chapter (relating to Control of Signs along Rural Roads).

§21.194.   *Construction and Appearance of Relocated Sign.*

(a)   A relocated sign must be constructed with the same number of poles and of the same type of materials as the existing sign. A relocated sign may not exceed the maximum height provided by §21.189 of this division (relating to Sign Height Restrictions). The number of sign faces and lighting, if any, of the relocated sign may not exceed the number of faces or lighting, if any, of the existing sign.

(b)   The size of each of the sign faces of a relocated sign that are visible to approaching traffic may not exceed the smaller of the size of the existing sign face or an area of 1,200 square feet, a height of 25 feet, and a length of 60 feet.

(c)   The sign faces of a relocated sign may be placed back-to-back, side-by-side, stacked, or in "V" type construction with not more than two displays facing any direction, except that if the area of a sign face exceeds 350 square feet, sign faces may not be stacked or placed side-by-side. The sign structure and sign faces are considered one sign.

§21.195.   *Relocation of Sign within Municipality.*

(a)   If an existing sign is located within the incorporated boundaries of a municipality that is approved by the department to control outdoor advertising under §21.200 of this division (relating to Local Control) and the sign will be relocated within the incorporated boundaries of the same municipality, permission to relocate the sign must be obtained only from the municipality in accordance with the municipality's sign and zoning ordinances.

(b)   Permission from the municipality to relocate the sign is required to receive relocation benefits from the department under §21.196 of this division (relating to Relocation Benefits).

§21.196.   *Relocation Benefits.*

(a)   Relocation benefits will be paid in accordance with Subchapter G of this chapter (relating to Relocation Assistance and Benefits) for the relocation of a sign under §21.192 of this division (relating to Permit for Relocation of Sign) or §21.195 of this division (relating to Relocation of Sign within Municipality).

(b)   The owner of an existing sign that is being relocated must enter into a written agreement with the governmental entity that is acquiring the right-of-way in which the sign is located. In the agreement the owner, in consideration of the payment by the governmental entity of relocation benefits, waives and releases any claim for damages against the governmental entity and the state for any temporary or permanent taking of the sign.

§21.197.   *Discontinuance of Sign Due to Destruction.*

(a)   If a sign is partially destroyed by a natural force outside the control of the permit holder, including wind, tornado, lightening, flood, fire, or hurricane, the department will determine whether the sign can be repaired without an amended permit.

(b) The department may require the sign owner to submit an estimate of the proposed work, including an itemized list of the materials to be used and the manner in which the work will be done. The department will allow the sign to be repaired without an amended permit if the department determines that the damage is not substantial. If the damage is determined to be substantial the sign owner must obtain an amended permit under §21.174 of this division (relating to Amended Permit).

(c) The department will cancel the existing permit if it determines the damage to the sign is substantial under subsection (g) of this section and an amended permit is not obtained by the sign owner within one year after the date that the department first became aware of the damage.

(d) If a permit is canceled under this section or §21.176 of this division (relating to Cancellation of Permit) the remaining sign structure must be dismantled and removed without cost to the state.

(e) A sign that is totally or partially destroyed by vandalism or a motor vehicle accident may be rebuilt as described on the most recently approved permit application.

(f) If a decision to cancel a permit is appealed, the sign may not be repaired during the appeal process.

(g) Damage is considered to be substantial if the cost to repair the sign would exceed 60 percent of the cost to replace it with a sign of the same basic construction using new materials and at the same location.

(h) If a sign is partially destroyed by a natural force outside the control of the sign owner in an area that receives a state or federal disaster declaration and the sign owner has documentation to show that the sign damage is not considered substantial the sign may be repaired without a prior determination by the department under subsection (b) of this section if the sign is repaired within 180 days after the date of the event and if within 60 days after the date of completion of the repairs, the owner submits to the department:

(1) photos of the partially destroyed sign and the repaired sign; and

(2) a notarized affidavit executed by the sign owner containing:

(A) the permit number of the sign;

(B) a statement that the sign was damaged by the natural force;

(C) a statement that the cost to repair the sign was less than 60 percent of the cost of a new sign with the same basic construction; and

(D) a statement that the sign was repaired in the same configuration and with like materials according to the most recent approved permit.

(i) A sign repaired in violation of this subsection is subject to enforcement and removal.

§21.198. Order of Removal.

(a) If a sign permit expires without renewal or is canceled or if the sign is erected or maintained in violation of this division, the owner of the sign, on a written demand by the department, shall remove the sign at no cost to the state.

(b) If the owner does not remove the sign within 30 days of the day that the demand is sent, the department will remove the sign and will charge the sign owner for the cost of removal, including the cost of any court proceedings.

(c) The department will rescind a removal demand if the department determines the demand was issued incorrectly.

§21.199. Destruction of Vegetation and Access from Right of Way Prohibited.

(a) A person may not:

(1) trim or destroy a tree or other vegetation on the right of way for any purpose related to this division; or

(2) erect or maintain a sign from the right of way.

(b) The department will initiate enforcement action if the permit holder, or someone acting on behalf of the permit holder, violates this section.

(c) Subsection (a)(2) of this section does not apply to the maintenance of a sign if:

(1) the state right of way is the only available access for a sign on railroad right of way to which §21.150(b) of this division (relating to Continuance of Nonconforming Signs) applies; and

(2) the sign owner notifies the department and obtains approval of the department before accessing the sign for maintenance.

(d) It is not a violation to trim the portion of the tree or vegetation that encroaches onto private property at the private property line as long as the trimming occurs from the private property.

§21.200. Local Control.

(a) The department may authorize a political subdivision to exercise control over outdoor signs in its jurisdiction. If the political subdivision receives approval under this section, it will be listed as a certified city and a permit issued by that political subdivision is acceptable instead of a permit issued by the department within the approved area.

(b) To be considered for authorization under this section, the political subdivision must submit to the department:

(1) a copy of its sign regulations;

(2) a copy of its zoning regulations;

(3) information about the number of personnel who will be dedicated to the program and what type of records will be maintained, including whether the political subdivision maintains an inventory of signs that can be provided to the department in an electronic format that is acceptable to the department; and

(4) an enforcement plan that includes the removal of illegal signs.

(c) The department, after consulting with the Federal Highway Administration, shall determine whether a political subdivision has established and will enforce within its corporate limits standards and criteria for size, lighting, and spacing of outdoor signs consistent with the purposes of the Highway Beautification Act of 1965, 23 United States Code §131, and with customary use. The size, lighting, and spacing requirements of the political subdivision may be more or less restrictive than the requirements of this division as long as the requirements comply with the federal requirements, such as the prohibition of signs over 1,200 square feet in size and spacing of less than 500 feet. The authorization does not include the area in a municipality's extraterritorial jurisdiction.

(d) The department may meet with a political subdivision to ensure that it is enforcing the standards and criteria in accordance with subsection (c) of this section.

(e) After approval under this section, the political subdivision shall:

(1) provide to the department:

(A) a copy of each amendment to its sign and zoning regulations when the amendment is proposed and adopted; and

(B) a copy of any change to its corporate limits and its extraterritorial jurisdiction, if covered by the approval;

(2) annually provide to the department:

(A) an electronic copy of the sign inventory; and

(B) report of the number of sign permits issued and the status of all pending enforcement actions; and

(3) participate in at least one video conference or teleconference sponsored by the department each year.

(f) The political subdivision may:

(1) set and retain the fees for issuing a sign permit; and

(2) establish the period for which a sign permit is effective.

(g) The department will conduct an on-site compliance monitoring review every two years.

(h) The department may withdraw the approval of a political subdivision given under this section if the department determines that the political subdivision does not have an effective sign control program. The department will consider whether:

(1) the standards and criteria of political subdivision's sign regulations continue to meet the requirements of subsection (c) of this section;

(2) the political subdivision maintains an accurate sign inventory and annually provides the inventory to the department in an electronic format; and

(3) the political subdivision enforces the sign regulations and annually reports enforcement actions as required.

(i) The department may reinstate a political subdivision's authority on the showing of a new plan that meets the requirements of subsection (c) of this section.

§21.201. *Fees Nonrefundable.*

A fee paid to the department under this division is nonrefundable.

§21.202. *Property Right Not Created.*

Issuance of a permit or license under this division does not create a contract or property right in the permit or license holder.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101265
Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683



# DIVISION 2.  ELECTRONIC SIGNS

**43 TAC §§21.251 - 21.260**

STATUTORY AUTHORITY

The new sections are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

§21.251. *Definition.*
In this division, "electronic sign" means a sign, display, or device that changes its message or copy by programmable electronic or mechanical processes.

§21.253. *Issuance of Permit.*

(a) The department will issue a permit for an electronic sign if the application for the permit:

(1) satisfies the requirements of this division and any applicable requirements of Division 1 of this subchapter (relating to Signs); and

(2) has attached to it:

(A) a certified copy of the permit issued by the municipality that gives permission for the electronic sign; or

(B) if the municipality does not issue permits, a certified copy of written permission for the electronic sign from the municipality.

(b) A permit from the department is required for the erection of an electronic sign even if the requested sign location is within a city certified under §21.200 of this chapter (relating to Local Control).

§21.255. *Location.*

(a) An electronic sign may be located, relocated, or upgraded only along a regulated highway and within:

(1) the corporate limits of a municipality that allows electronic signs under its sign or zoning ordinance; or

(2) within the extraterritorial jurisdiction of a municipality described by paragraph (1) of this subsection that under state law has extended its municipal regulation to include that area.

(b) Two electronic signs may not be located on the same sign structure. An electronic sign may not be located within 1,500 feet of another electronic sign on the same side of the highway.

§21.259. *Contact Information.*

(a) The owner of an electronic sign shall provide to the department contact information for a person who is available to be contacted at any time and who is able to turn off the electronic sign promptly if a malfunction occurs or is able to accommodate an emergency notification request from a local authority under §21.258 of this division (relating to Emergency Information).

(b) The department will share the contact information with the appropriate local authority that has jurisdiction over the location of the electronic sign.

*§21.260.   Application of Other Rules.*

The requirements and other provisions of Division 1 of this subchapter (relating to Signs) apply to an electronic sign, except that if this division conflicts with a provision of Division 1 of this subchapter, this division controls.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101266
Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683



# SUBCHAPTER K.   CONTROL OF SIGNS ALONG RURAL ROADS

## 43 TAC §§21.401, 21.411, 21.421, 21.431, 21.441, 21.451, 21.461, 21.471, 21.481, 21.491, 21.501, 21.511, 21.521, 21.531, 21.541, 21.542, 21.551, 21.561, 21.571, 21.572, 21.581

STATUTORY AUTHORITY

The repeals are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101264

Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683



## 43 TAC §§21.401 - 21.442, 21.444 - 21.446

STATUTORY AUTHORITY

The new sections are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

*§21.402.   Definitions.*

The following words and terms, when used in this subchapter, shall have the following meanings, unless the context clearly indicates otherwise.

(1)   Commission--The Texas Transportation Commission.

(2)   Department--The Texas Department of Transportation.

(3)   Erect--To construct, build, raise, assemble, place, affix, attach, embed, create, paint, draw, or in any way bring into being or establish.

(4)   Main-traveled way--The through traffic lanes exclusive of frontage roads, auxiliary lanes, and ramps.

(5)   Permit--The authorization granted for the erection of a sign, subject to this subchapter and Transportation Code, Chapter 394.

(6)   Person--An individual, association, partnership, limited partnership, trust, corporation, or other legal entity.

(7)   Portable sign--A sign designed to be mounted on a trailer, bench, wheeled carrier, or other non-motorized mobile structure or on skids or legs.

(8)   Rural road--A road, street, way, highway, thoroughfare, or bridge that is located in an unincorporated area and is not privately owned or controlled, any part of which is open to the public for vehicular traffic, and over which the state or any of its political subdivisions have jurisdiction.

(9)   Sign--A thing that is designed, intended, or used to advertise or inform, including a sign, display, light, device, figure, painting, drawing, message, plaque, placard, poster, billboard, logo, or symbol.

(10) Sign face--The part of the sign that contains the advertising or information contents and is distinguished from other parts of the sign and another sign face by borders or decorative trim. The term does not include a lighting fixture, apron, or catwalk unless it displays a part of the advertising or information contents of the sign.

(11) Sign structure--All of the interrelated parts and materials, such as beams, poles, braces, apron, catwalk, and stringers, that are used, designed to be used, or intended to be used to support or display a sign face.

§21.407. *Existing Off-Premise Signs.*

(a) A sign that existed before September 1, 1985 and that was registered not later than December 30, 1985 does not require a permit issued under this subchapter as long as the registration remains valid.

(b) The sign registration is valid only for the location indicated on the original registration application and only for the sign described on that application.

(c) The sign registration must be renewed on or before January 1 of the year of its expiration.

(d) The registration will automatically terminate if:

(1) the sign is removed for any reason other than to change the advertising;

(2) the registration is not renewed; or

(3) the sign is replaced with another structure.

(e) To renew the registration, the holder must:

(1) file a written request, on the form prescribed by the department;

(2) submit a renewal fee of $10 per year for a period of up to five years; and

(3) display the registration number on the sign structure in numerals with a minimum height of two inches and a minimum width of one inch.

(f) The registration allows for routine and customary repairs and maintenance as provided under §21.434 of this subchapter (relating to Repair and Maintenance), but substantial changes are not authorized for existing signs. An amended permit under §21.423 of this subchapter (relating to Amended Permit) must be obtained prior to performing any customary repairs or maintenance.

(g) The owner of an off-premise sign that was in existence before September 1, 1985 and not duly registered or the registration for which was timely renewed shall remove the sign at the owner's expense upon written notification by the department, unless it is an exempt sign.

(h) The registration of a sign may be transferred upon filing with the department, on a form prescribed by the department, a request for the transfer and payment of the transfer fee.

§21.408. *Continuance of Nonconforming Signs.*

(a) Notwithstanding other provisions of this subchapter, the department will renew a permit for a nonconforming sign only if the sign structure:

(1) was lawful on the later of the date it was erected or became subject to the control of the department; and

(2) remains substantially the same as it was on the later of the date it was erected, became subject to the department's control, or became a nonconforming sign due to change in statute, rule, or condition.

(b) A nonconforming sign may not be:

(1) removed and re-erected for any reason, other than a request by a governmental entity; or

(2) substantially changed, as described by §21.434 of this subchapter (relating to Repair and Maintenance).

§21.409. *Permit Application.*

(a) To obtain a permit for a sign, a person must file an application in a form prescribed by the department. The application at a minimum must include:

(1) the complete name and address of the applicant;

(2) the original signature of the applicant;

(3) the proposed location and description of the sign;

(4) the complete legal name and address of the owner of the designated site;

(5) a statement of whether the requested sign is located within an incorporated city or a city's extraterritorial jurisdiction;

(6) the site owner's or the owner's authorized representative's signature on the application demonstrating consent to the erection and maintenance of the sign and right of entry onto the property of the sign location by the department or its agents;

(7) information that details how and the location from which the sign will be erected and maintained; and

(8) additional information the department considers necessary to determine eligibility.

(b) The application must be:

(1) notarized;

(2) filed with the department's division responsible for the Outdoor Advertising Program in Austin; and

(3) accompanied by the fee prescribed by §21.424 of this subchapter (relating to Permit Fees).

(c) The application must include a sketch that shows:

(1) the location of the poles of the sign structure;

(2) the exact location of the sign faces in relation to the sign structure;

(3) the means of access to the sign; and

(4) the distance from the buildings, landmarks, right of way line, other signs, and other distinguishable features of the landscape.

§21.410. *Site Owner's Consent; Withdrawal.*

(a) A site owner's consent to the erection and maintenance of the sign and access to the site by the department or its agent is provided with a permit application under §21.409 of this subchapter (relating to Permit Application). The consent operates for the life of the lease or until the owner delivers to the department and the sign owner a written statement that permission for the maintenance or inspection by the department or its agents of the sign has been withdrawn and documentation showing that the lease allowing the sign has been terminated in accordance with the terms of the lease agreement or through a court order.

(b) If the sign owner provides documentation that the sign owner is disputing the lease termination, the department will not cancel the permit until a settlement signed by both parties or a court order settling the dispute is delivered to the department.

§21.412. *Permit Application Review.*

(a) The department will consider permit applications in the order of the receipt of the applications.

(b) If an application is returned to an applicant because it is not complete or has incorrect information, the application loses its priority position.

(c) The department will hold an application that is for the same site as or a conflicting site with that of an application that the department previously received until the department makes a final decision on the previously received application or returns it to the applicant. For the purposes of this subsection, the date of a final decision on an application is:

(1) the date of the final decision on an appeal under §21.418 of this subchapter (relating to Appeal Process for Permit Denials); or

(2) if an appeal is not filed within the period provided by §21.418 of this subchapter, on the 46th day after the date the denial notice was received under §21.413 of this subchapter (relating to Decision on Application).

(d) The department will review the permit application for completeness and compliance with all requirements of this subchapter. Measurements will be taken at the site to determine if the sign placement meets the spacing and location requirements.

§21.413. Decision on Application.

(a) The department will make a decision on an application within 45 days of the date of receipt of the application. If the decision cannot be made within the 45 day period the department will notify the applicant of the delay providing the reason for the delay, and provide an estimate of when the decision will be made.

(b) If the application is approved, the department will issue a permit for the sign by sending a copy of the approved application and a sign permit plate to the applicant.

(c) If the application is not approved, the department will send a copy of the denied application and a notice that states the reason for the denial.

(d) If an application is denied, the department will notify the landowner identified on the permit application of the denial. The notice is for informational purposes only, and does not convey any rights to the landowner. The landowner may not appeal the denial unless the landowner is also the applicant.

§21.414. Sign Permit Plate.

(a) The sign owner shall securely attach the sign permit plate to the part of the sign structure that is nearest to the rural road and visible from the closest right of way not later than the 30th day after the date that the sign is erected.

(b) The sign permit plate may not be removed from the sign.

(c) The sign permit plate must remain visible from the closest right of way at all times.

(d) If a sign permit plate is lost or stolen or becomes illegible, the sign owner must submit to the department a request for a replacement plate in a form prescribed by the department accompanied by the replacement plate fee prescribed by §21.424 of this subchapter (relating to Permit Fees).

(e) Failure to apply for a replacement permit or attach the plate to the sign structure as required in subsection (a) of this section within 60 days of the date of written notification from the department that the permit plate is not visible or attached may result in an enforcement action under §21.425 or §21.426 of this subchapter (relating to Cancellation of Permit and Administrative Penalties, respectively).

§21.416. Commercial or Industrial Activity.

(a) For the purposes of this subchapter, a commercial or industrial activity is an activity that:

(1) is customarily allowed only in a zoned commercial or industrial area; and

(2) is conducted in a permanent building or structure affixed to the real property that:

(A) has an indoor restroom, running water, functioning electrical connections, and permanent flooring, other than dirt, gravel, or sand;

(B) is visible from the traffic lanes of the main-traveled way;

(C) is not primarily used as a residence; and

(D) has at least 400 square feet of its interior floor space devoted to the activity.

(b) The following are not commercial or industrial activities:

(1) agricultural, forestry, ranching, grazing, farming, and related activities, including the operation of a temporary wayside fresh produce stand;

(2) an activity that is conducted only seasonally;

(3) an activity that has not been conducted at its present location for at least 180 days;

(4) an activity that is not conducted by at least one person who works for the business at the activity site for at least 25 hours per week on at least five days per week and for which the hours during which the activity is conducted are posted at the activity site;

(5) the operation or maintenance of:

(A) an outdoor advertising structure;

(B) a recreational facility, such as a campground, golf course, tennis court, wild animal park, or zoo, other than the related activities conducted in a building or structure that meets the requirements of subsection (a)(2) of this section and the parking facilities for that building or structure;

(C) an apartment house or residential condominium;

(D) a public or private preschool, secondary school, college, or university, other than a trade school or corporate training campus;

(E) a quarry or borrow pit, other than the related activities conducted in a building or structure that meets the requirements of subsection (a)(2) of this section and the parking facilities for that building or structure;

(F) a cemetery; or

(G) a place that is primarily used for worship;

(6) an activity that is conducted on a railroad right of way; and

(7) an activity that is created primarily or exclusively to qualify an area as an unzoned commercial or industrial area.

(c) For the purposes of this section, a building is not primarily used as a residence if more than 50 percent of the building's square footage is used solely for the business activity.

(d) A sign is not required to meet the requirements of subsections (a)(2)(C) (as clarified by subsection (c) of this section), (a)(2)(D),

(b)(3), or (b)(4) of this section to maintain conforming status if the permit for the sign was issued before the effective date of this section.

### §21.418. Appeal Process for Permit Denials.

(a) If a sign permit is denied, the applicant may file a request with the executive director for an appeal.

(b) The request for appeal must:

(1) be in writing;

(2) contain:

(A) a copy of the denied permit application;

(B) a statement of why the denial is believed to be in error; and

(C) evidence that supports the issuance of the application, such as drawings, surveys, or photographs; and

(3) be received within 45 days after the date the denial notice was received.

(c) The executive director or the executive director's designee, who may not be below the level of assistant executive director, will make a final determination on the appeal within 60 days after the date that the executive director receives the request for appeal. If the final determination is that the permit is denied, the executive director or the executive director's designee will send the final determination to the applicant stating the reason for denial. If the final determination is that the application be approved, the department will issue the permit in accordance with §21.413 of this subchapter (relating to Decision on Application).

(d) If the executive director or the designee is unable to make a final determination on the appeal within the 60-day period under subsection (c) of this section, the department will notify the applicant by mail of the delay and provide an estimated time in which a final determination will be made.

### §21.420. Permit Expiration.

A permit is valid for one year.

### §21.421. Permit Renewals.

(a) To continue in effect, a permit must be renewed.

(b) A permit is eligible for renewal if the sign for which it was issued continues to meet all applicable requirements of this subchapter and Transportation Code, Chapter 394.

(c) To renew the permit, the permit holder must file with the department a written application in a form prescribed by the department accompanied by the applicable fees prescribed by §21.424 of this subchapter (relating to Permit Fees). The application must be received by the department before the 46th day after the date of the permit expiration.

(d) A permit may not be renewed if the sign for which it was issued is not erected to the extent that it includes a sign face before the first anniversary of the date the permit was issued.

(e) The department will provide a renewal notification to the licensee at least 30 days before the date of the permit expiration and if the permit is not renewed before it expires the department within 20 days after the date of expiration will provide notification to the licensee of the opportunity to file a late renewal.

### §21.423. Amended Permit.

(a) To perform customary maintenance or to make substantial changes to the sign or sign structure under §21.434 of this subchapter

(relating to Repair and Maintenance), a permit holder must submit an amended permit application.

(b) The amended permit application must be submitted on a form prescribed by the department that provides the information required under §21.409 of this subchapter (relating to Permit Application) that is applicable to an amended permit and indicates the change from the information in the original application for the sign permit. The amended permit will not require the signature of the land owner or city representative.

(c) The new sign face size, configuration, or location must meet all applicable requirements of this subchapter.

(d) The holder of a permit for a nonconforming sign may apply for an amended permit to perform eligible customary maintenance under §21.434 of this subchapter. An amended permit will not be issued for a substantial change, as described by §21.434(c) of this subchapter, to a nonconforming sign.

(e) Making a change to a sign that requires an amended permit without first obtaining an amended permit is a violation of this subchapter and will result in an administrative enforcement action.

(f) The department will make a decision on an amended permit application within 45 days of the date receipt of the amended permit application. If the decision cannot be made within the 45 day period the department will notify the applicant of the delay, provide the reason for the delay, and provide an estimate for when the decision will be made.

(g) In the event of a natural disaster the department may waive the requirement that a required amended permit be issued prior to the repair of a conforming sign. If the department waives this requirement the amended permit must be submitted within 60 days of the completion of the repairs. If the repairs are in violation of these rules or the permit holder fails to submit the amended permit application the sign is subject to enforcement and removal actions.

### §21.424. Permit Fees.

(a) The amounts of the fees related to permits under this subchapter are:

(1) $100 for an original or amended permit for a sign;

(2) $75 for the renewal of a permit;

(3) $25 for the transfer of a permit up to a maximum of $2,500 for a single transaction regardless of the location of the sign; and

(4) $25 for a replacement sign permit plate.

(b) In addition to the $75 annual renewal fee, an additional late fee of $100 is required for a renewal of a permit that is received before the 46th day after the permit expiration date.

(c) A fee prescribed by this section is payable by check, cashier's check, or money order. If a check or money order is dishonored upon presentment, the permit, renewal, or transfer is void.

### §21.425. Cancellation of Permit.

(a) The department will cancel a permit for a sign if the sign:

(1) is removed, unless the sign is removed and re-erected at the request of a condemning authority;

(2) is not maintained in accordance with this subchapter or Transportation Code, Chapter 394;

(3) is damaged beyond repair, as determined under §21.439 of this subchapter (relating to Discontinuance of Sign Due to Destruction);

(4) is abandoned, as determined under §21.427 of this subchapter (relating to Abandonment of Sign);

(5) is erected after the effective date of this section and is not built within 20 feet of the location described in the permit application or is built within 20 feet of the location described in the permit application but at a location that does not meet all spacing requirements of this chapter or in accordance with the sketch or other assertions contained in the permit application;

(6) is repaired or altered without obtaining a required amended permit under §21.423 of this subchapter (relating to Amended Permit);

(7) is built by an applicant who uses false information on a material issue of the permit application;

(8) is erected, repaired, or maintained in violation of §21.441 of this subchapter (relating to Destruction of Vegetation and Access from Right of Way Prohibited);

(9) has been made more visible by the permit holder clearing vegetation from the highway right of way in violation of §21.441 of this subchapter;

(10) is in an unzoned commercial or industrial area and the department has evidence that an activity supporting the unzoned commercial or industrial area was created primarily or exclusively to qualify the area as an unzoned commercial or industrial area and that no business has been conducted at the activity site within one year; or

(11) does not have the permit plate properly attached under §21.414 of this subchapter (relating to Sign Permit Plate).

(b) Before initiating an enforcement action under this section, the department will notify a sign owner in writing of a violation of subsection (a)(5) or (11) of this section and will give the sign owner 60 days to correct the violation and provide proof of the correction to the department.

(c) Upon determination that a permit should be canceled, the department will mail a notice of cancellation to the address of the record license holder. The notice must state:

(1) the reason for the cancellation;

(2) the effective date of the cancellation;

(3) the right of the permit holder to request an administrative hearing on the cancellation; and

(4) the procedure for requesting a hearing and the period for filing the request.

(d) A request for an administrative hearing under this section must be in writing and delivered to the department within 45 days after the date that the notice of cancellation is received.

(e) If timely requested, an administrative hearing will be conducted in accordance with Chapter 1, Subchapter E of this title (relating to Procedures in Contested Case) and the cancellation will be abated until the cancellation is affirmed by order of the commission.

(f) A permit holder may voluntarily cancel a permit by submitting a request in writing after the sign for which the permit was issued has been removed. Subsections (c) - (e) of this section do not apply to a permit voluntarily canceled under this subsection.

(g) The department will notify the landowner identified on the permit application of a cancellation enforcement action. The notice is for informational purposes only, and does not convey any rights to the landowner. The landowner may not appeal the cancellation unless the landowner is also the permit holder.

§21.426. *Administrative Penalties.*

(a) The department may impose administrative penalties against a person who intentionally violates Transportation Code, Chapter 394 or this subchapter.

(b) The amount of the administrative penalty may not exceed the maximum amount of a civil penalty that may be imposed under Transportation Code, §394.081 and will based on the following:

(1) $150 for a violation of a permit plate requirement under §21.414 of this subchapter (relating to Sign Permit Plate);

(2) $250 for a violation of:

(A) a registration requirement of §21.407 of this subchapter (relating to Existing Off-Premise Signs); or

(B) erecting the sign at the location other than the location specified on the application, except that if the actual sign location does not conform to all other requirements the department will seek cancellation of the permit;

(3) $500 for:

(A) maintaining or repairing the sign from the state right of way; or

(B) performing customary maintenance on any sign or substantial maintenance on a conforming sign without first obtaining an amended permit; or

(4) $1000 for erecting a sign from the right of way.

(c) In addition to the penalties assessed under subsection (b) of this section, the department may seek to recover the cost of repairing any damage to the right of way done by the sign owner or on the sign owner's behalf.

(d) Before initiating an enforcement action under this section, the department will notify the sign owner in writing of a violation of subsection (b)(1) or (2)(B) of this section and will give the sign owner 60 days to correct the violation and provide proof of the correction to the department.

(e) Upon determination to seek administrative penalties the department will mail a notice of the administrative penalties to the last known address of the permit holder. The notice must clearly state:

(1) the reasons for the administrative penalties;

(2) the amount of the administrative penalty; and

(3) the right of the holder of the permit to request an administrative hearing.

(f) A request for an administrative hearing under this section must be made in writing and delivered to the department within 45 days after the date of the receipt of the notice.

(g) If timely requested, an administrative hearing shall be conducted in accordance with Chapter 1, Subchapter E of this title (relating to Procedures in Contested Case), and the imposition of administrative penalties will be abated unless and until that action is affirmed by order of the commission.

§21.428. *Sign Face Size and Positioning.*

(a) An off-premise sign face may not exceed:

(1) 672 square feet in area;

(2) 25 feet in height; and

(3) 60 feet in length.

(b) For the purposes of subsection (a) of this section, border and trim are included as part of the sign face.

(c) Notwithstanding the area limitation provided by subsection (a)(1) of this section, one or more temporary protrusions may be added to a sign, provided that:

(1) the sign face, including the protrusions, meets the height and length limitations of subsection (a) of this section;

(2) the area of the protrusion does not exceed 35 percent of the area indicated on the sign permit; and

(3) the sign face, including the area of the protrusions, does not exceed 907 square feet in area.

(d) The area is measured by the smallest square, rectangle, triangle, circle, or combination that encompasses the entire sign face.

(e) A sign may not be erected that has more than two faces fronting a particular direction of travel on the main-traveled way.

(f) A sign erected in a back-to-back or V-type configuration, may have only one face fronting a particular direction of travel.

(g) A sign face that exceeds 454 square feet in area, including cutouts, may not be stacked on or placed side by side with another sign face. Two sign faces may not be stacked or placed side by side if combined they exceed 907 square feet in area.

(h) A sign face may consist of commercial electronic variable message signs (CEVMS), otherwise referred to as rotating slat signs or tri-vision signs, provided that the rotation is completed within one second and the message is stationary for at least 10 seconds following a rotation.

(i) If a sign is built with a smaller face than the size shown on the permit application or if the face is reduced in size after it is built, an amended permit will be required to increase the size of the face.

§21.429. *Spacing of Signs.*

(a) An off-premise sign having a sign face area of at least 301 square feet may not be located within 1,500 feet of another off-premise sign on the same side of the roadway.

(b) An off-premise sign having a sign face area of at least 100 but less than 301 square feet may not be located within 500 feet of another off-premise sign having a sign face within that range or within 1500 feet of an off-premise sign that has a sign face of at least 301 square feet and is on the same side of the roadway.

(c) An off-premise sign having a face area of less than 100 square feet may not be located within 150 feet of another off-premise sign having a sign face of less than 100 square feet, within 500 feet of a sign with a face area of at least 100 but less than 301 square feet, or within 1,500 feet of an off-premise sign with a face area of at least 301 square feet that is on the same side of the roadway.

(d) Two signs located at the same intersection do not violate this section if they:

(1) are located so that their messages are not directed toward traffic flowing in the same direction; and

(2) are not visible from the main-traveled way of an interstate or federal-aid primary highway.

(e) For the purposes of this section, the space between signs is measured between points along the right of way of the roadway perpendicular to the center of the signs.

(f) The spacing requirements of this section do not apply to signs separated by buildings, natural surroundings, or other obstruc-

tions in a manner that causes only one of the signs to be visible within the specified spacing area.

(g) An off-premise sign may not be erected within five feet of a rural road right-of-way line.

(h) An off-premise sign must be erected within 800 feet of at least one recognized commercial or industrial activity. The commercial or industrial activity must be on the same side of the rural road as the sign.

(i) Distance from the commercial or industrial activity is measured from the outer edges of the regularly used buildings, parking lots, storage facilities, or processing areas of the commercial or industrial activity. Measurements are not made from the property line unless the property lines coincide with the regularly used portions of the activity.

(j) A sign may not be located in a place that creates a safety hazard, including a location that:

(1) is likely to cause a driver to be unduly distracted;

(2) obscures or interferes with the effectiveness of an official traffic sign, signal, or device; or

(3) obstructs or interferes with the driver's view of approaching, merging, or intersecting roadway or rail traffic.

(k) A sign may not be located in an area that is adjacent to or within 1,000 feet of a rest area.

(l) The distance from a rest area is measured along the right of way line from the outer edges of the rest area boundary abutting the right of way.

(m) The center of a sign may not be located within 250 feet of the nearest point of the boundary of a public park.

(n) This subsection applies only if a public park boundary abuts the right of way of a regulated highway. A sign may not be located within 1,500 feet of the boundary of the public park, as measured along the right of way line from the nearest common point of the park's boundary and the right of way. This limitation applies on both sides of the rural road.

§21.432. *Height Restrictions.*

(a) Except as provided in subsection (f) of this section a sign may not be erected that exceeds an overall height of 42-1/2 feet.

(b) A roof sign that has a solid sign face surface may not at any point exceed 24 feet above the roof level.

(c) A roof sign that has an open sign face in which the uniform open area between individual letter or shapes is not less than 40 percent of the total gross area of the sign face may not at any point exceed 40 feet above the roof level.

(d) The lowest point of a projecting roof sign or a wall sign must be at least 14 feet above grade.

(e) For the purposes of this section, height is measured from the grade level of the centerline of the main-traveled way closest to the sign, at a point perpendicular to the sign location.

(f) The height measurement does not include any renewable energy device such as solar panels or wind turbines that are attached to the sign structure above the sign face to improve the energy efficiency of the sign structure.

§21.433. *Lighting.*

(a) A sign may not contain or be illuminated by any flashing, intermittent, or moving light except that this subsection does not apply

to a sign that only provides public service information, such as time, date, temperature, or weather.

(b)    Except for a relocated sign, any new sign may be illuminated but only by:

(1)    upward lighting of no more than four luminaires per direction of the sign face or faces of the structure; or

(2)    downward lighting of no more than four luminaires per direction of the sign face or faces of the structure.

(c)    Lights that are a part of or illuminate a sign:

(1)    must be shielded, directed, and positioned to prevent beams or rays of light from being directed at any portion of the traveled ways of a regulated rural road;

(2)    may not be of such intensity or brilliance as to cause vision impairment of a driver of any motor vehicle on a regulated rural road or otherwise interfere with the driver's operation of a motor vehicle; and

(3)    may not obscure or interfere with the effectiveness of an official traffic sign, device, or signal.

(d)    A temporary protrusion on a sign may be animated only if it does not create a safety hazard to the traveling public. A temporary protrusion may not be illuminated by flashing or moving lights or enhanced by reflective material that creates the illusion of flashing or moving lights.

(e)    Reflective paint or reflective disks may be used on a sign face only if the paint or disks do not:

(1)    create the illusion of flashing or moving lights; or

(2)    cause an undue distraction to the traveling public.

(f)    A neon light may be used on a sign face only if:

(1)    the light does not flash;

(2)    the light does not cause an undue distraction to the traveling public; and

(3)    the permit for the sign specifies that the sign is an illuminated sign.

(g)    This subchapter does not prohibit a temporary protrusion that displays only alphabetical or numerical characters and that satisfies this subsection and the requirements of §21.428 of this subchapter (relating to Sign Face Size and Positioning) relating to a temporary protrusion. The display on the temporary protrusion may be a digital or other electronic display, but if so:

(1)    it must consist of a stationary image;

(2)    it may not change more frequently than four times in any 24 hour period; and

(3)    the process of any change of display must be completed within two minutes.

§21.434.    *Repair and Maintenance.*

(a)    The following are considered to be routine maintenance activities that do not require an amended permit:

(1)    the replacement of nuts and bolts;

(2)    nailing, riveting, or welding;

(3)    cleaning and painting;

(4)    manipulation of the sign structure to level or plumb it;

(5)    changing of the advertising message;

(6)    the replacement of minor parts if the materials of the minor parts are the same type as those being replaced and the basic design or structure of the sign is not altered;

(7)    changing all or part of the sign face structure but only if materials similar to those of the sign face being replaced are used; and

(8)    upgrading existing lighting for an energy efficient lighting system.

(b)    The following are considered to be customary maintenance activities that may be made but require an amended permit prior to the initiation of such an activity:

(1)    replacement of poles, but only if not more than one-half of the total number of poles of the sign structure are replaced in any 12 month period and the same material is used for the replacement poles; and

(2)    adding a catwalk to the sign structure.

(c)    The following are examples of substantial changes that may be made but require an amended permit application before the initiation of such an activity:

(1)    adding lights to an unilluminated sign or adding more intense lighting to an illuminated sign whether or not the lights are attached to the sign structure;

(2)    changing the number of poles in the sign structure;

(3)    adding permanent bracing wires, guy wires, or other reinforcing devices;

(4)    changing the material used in the construction of the sign structure, such as replacing wooden material with metal material;

(5)    adding faces to a sign or changing the sign configuration;

(6)    increasing the height of the sign;

(7)    changing the configuration of the sign structure, such as changing a "V" sign to a stacked or back to back sign, or a single face sign to a back-to back sign; and

(8)    moving the sign structure or sign face in any way unless the movement is made in accordance with §21.435 of this subchapter (relating to Permit for Relocation of Sign).

(d)    To add a catwalk to a sign structure the catwalk must meet Occupational Safety and Health Administration guidelines.

§21.435.    *Permit for Relocation of Sign.*

(a)    A sign may be relocated in accordance with this section, §21.436 of this subchapter (relating to Location of Relocated Sign), and §21.437 of this subchapter (relating to Construction and Appearance of Relocated Sign) if the sign is legally erected and maintained and will be within the highway right of way as a result of a construction project.

(b)    To relocate a sign under this section, the permit holder must obtain a new permit under §21.409 of this subchapter (relating to Permit Application), but the permit fee is waived.

(c)    To receive a new permit to relocate a sign, the permit holder must submit a new permit application that identifies that the application is for the relocation of an existing sign due to a highway project. The new location must meet all local codes, ordinances, and applicable laws.

(d)    Notwithstanding other provisions of this section, if only a part of a sign will be located within the highway right of way as a result of the construction project, the sign owner may apply to amend an existing permit for the sign to authorize:

(1)  the relocation of the sign face of a monopole sign that would overhang the proposed right of way from that location to the land on which the sign's pole is located;

(2)  the relocation of the poles and sign face of a multiple sign structure that are located in the proposed right of way from the proposed right of way to the land on which the other poles of the sign structure are located; or

(3)  a reduction in the size of a sign structure that is located partially in the proposed right of way, so that the sign structure and sign face are removed from the proposed right of way.

(e)  A permit for the relocation of a sign must be submitted within 36 months from the earlier of the date the original sign was removed or the date the original sign was required to move. The sign owner is required to continue to renew the sign permit and pay the permit renewal fee for the sign to remain eligible for relocation.

§21.436.  *Location of Relocated Sign.*

(a)  To receive a new permit for relocation, an existing sign must be relocated on a part of the same parcel of land on which the sign was situated before relocation in a location that is allowed under this section.

(b)  If the sign owner can demonstrate that the location under subsection (a) of this section is not physically or economically feasible for a sign structure, the sign owner, on approval by the department, may relocate the sign to any other location that is allowed under this section. The owner is not entitled to additional relocation benefits under §21.438 of this subchapter (relating to Relocation Benefits) if the sign structure is relocated further than 50 miles from the location of the existing sign.

(c)  The location of the relocated sign must be within the required distance of a commercial or industrial activity as described by §21.416 of this subchapter (relating to Commercial or Industrial Activity).

(d)  A sign may not be relocated to a place where it:

(1)  is likely to cause a driver to be unduly distracted in any way;

(2)  will obscure or otherwise interfere with the effectiveness of an official traffic sign, signal, or device; or

(3)  will obstruct or interfere with the driver's view of approaching, merging, or intersecting motor vehicle or rail traffic.

(e)  A sign may not be relocated from a rural road to a highway that is subject to Subchapter I of this chapter (relating to Regulation of Signs along Interstate and Primary Highways).

(f)  Spacing requirements of §21.429(a) - (c) of this subchapter (relating to Spacing of Signs) apply to signs relocated under this section.

(g)  A sign may not be relocated to a place that is:

(1)  within 500 feet of a public park that is adjacent to a rural road on either side of the roadway; or

(2)  within five feet of any highway right of way line.

§21.439.  *Discontinuance of Sign Due to Destruction.*

(a)  If a sign is partially destroyed by a natural force outside the control of the permit holder, including wind, tornado, lightening, flood, fire, or hurricane, the department will determine whether the sign can be repaired without an amended permit.

(b)  The department may require the permit holder to submit an estimate of the proposed work, including an itemized list of the mate-rials to be used and the manner in which the work will be done. The department will allow the sign to be repaired without an amended permit if the department determines that the damage is not substantial. If the damage is determined to be substantial the sign owner must obtain an amended permit under §21.423 of the subchapter (relating to Amended Permit).

(c)  The department will cancel the existing permit if it determines the damage to the sign is substantial under subsection (g) of this section and an amended permit is not obtained by the sign owner within one year after the date that the department first became aware of the damage.

(d)  If a permit is canceled under this section or §21.425 of this subchapter (relating to Cancellation of Permit) the remaining sign structure must be dismantled and removed without cost to the state.

(e)  A sign that is totally or partially destroyed by vandalism or a motor vehicle accident may be rebuilt as described on the most recently approved permit application.

(f)  If a decision to cancel a permit is appealed, the sign may not be repaired during the appeal process.

(g)  Damage is considered to be substantial if the cost to repair the sign would exceed 50 percent of the cost to replace it with a sign of the same basic construction using new materials and at the same location.

(h)  A sign that is partially destroyed by a natural force outside the control of the permit holder in an area that receives a state or federal disaster declaration and the sign owner has documentation to show that the sign damage would not be considered substantial the sign may be repaired without prior determination by the department if, repaired within 180 days of the event and if within 60 days of the completion of the repairs, the owner submits the following:

(1)  photos of the partially destroyed sign and the repaired sign; and

(2)  a notarized affidavit executed by the permit holder containing:

(A)  the permit number of the sign;

(B)  a statement that the sign was damaged by the natural force;

(C)  a statement that the cost to repair the sign was less than 60 percent of the cost of a new, sign with the same basic construction; and

(D)  a statement that the sign was repaired in the same configuration and with like materials according to the most recent approved permit.

(i)  A sign repaired in violation of this subsection is subject to enforcement and removal.

§21.441.  *Destruction of Vegetation and Access from Right of Way Prohibited.*

(a)  A person may not:

(1)  destroy a tree or other vegetation on the right of way for any purpose related to this subchapter; or

(2)  erect or maintain a sign from the right of way.

(b)  The department will initiate an enforcement action if the permit holder, or someone acting on behalf of the permit holder, violates this section.

(c)  It is not a violation to trim the portion of the tree or vegetation that encroaches onto private property at the private property line as long as the trimming occurs from the private property.

*§21.442.  On-Premise Signs.*

(a)  A business may not maintain more than five on-premise signs on a frontage of a single rural road at a single business location.

(b)  A permit under §21.404 of this subchapter (relating to Permit Required) is not required to erect an on-premise sign.

(c)  An on-premise sign is a sign that:

(1)  is located on the real property of a business and consists only of:

(A)  the name, logo, trademark, telephone number, and internet address of that business; or

(B)  an identification of that business's principal and accessory products or services offered on the property; or

(2)  only advertises the sale or lease of the real property on which the sign is located and is removed within 90 days after the date of the closing of the real property transaction.

(d)  For the purposes of this section, a sign is located on the real property of a business if:

(1)  the real property on which the sign is located and the real property on which the activity of the business is conducted are one contiguous tract that is under common ownership; or

(2)  the sign is located on the real property of a commercial development and the businesses of the development share the sign structure of that sign.

(e)  For the purpose of subsection (d)(1) of this section, real property is not considered to be a part of one contiguous tract if the real property on which the sign is located is:

(1)  separated from the real property on which the business activity is located by a road or highway or by another business;

(2)  devoted to a separate purpose unrelated to the advertised business activity;

(3)  held under an easement or other lesser property interest than the property interest in the land on which the business activity is located; or

(4)  is a narrow strip or other configuration of land that cannot be put to any reasonable use related to the advertised business activity other than for signing purposes.

(f)  A sign is not an on-premise sign if:

(1)  the sign consists principally of brand name or trade name advertising and the product or service advertised is only incidental to the principal activity;

(2)  the sign advertises activities that are not conducted on the premises; or

(3)  the sign provides rental income to the owner of the real property on which it is located, unless the owner of the real property receives the income from an on-premise business for the use of the sign.

(g)  For the purposes of this subsection:

(1)  the date of the closing of a sales transaction is the date that legal title to a property is conveyed to a purchaser for property under a contract to buy; and

(2)  the date of the closing of a lease transaction is the date that the landlord and tenant enter into a binding lease of a property.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101267
Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683

♦　　　♦　　　♦

## SUBCHAPTER Q.  REGULATION OF DIRECTIONAL SIGNS

**43 TAC §§21.941 - 21.947**

STATUTORY AUTHORITY

The new sections are adopted under Transportation Code, §201.101, which provides the commission with the authority to establish rules for the conduct of the work of the department, and more specifically, Transportation Code, §391.032, which provides authority to establish rules to regulate the orderly and effective display of outdoor advertising on primary roads; Transportation Code, §391.063, which provides authority for the commission to set fees for the issuance of an outdoor advertising license; Transportation Code, §391.065, which provides authority to establish rules to standardize forms and regulate the issuance of outdoor advertising licenses; Transportation Code, §394.004, which provides the commission with the authority to establish rules to regulate the erection and maintenance of signs on rural roads; and Transportation Code, §394.025, which provides authority for the commission to set fees for the issuance of an outdoor advertising license.

CROSS REFERENCE TO STATUTE

Transportation Code, Chapters 391 and 394.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on April 1, 2011.

TRD-201101268
Bob Jackson
General Counsel
Texas Department of Transportation
Effective date: July 1, 2011
Proposal publication date: December 3, 2010
For further information, please call: (512) 463-8683

♦　　　♦　　　♦

## PART 3.  AUTOMOBILE BURGLARY AND THEFT PREVENTION AUTHORITY